# Exhibit C

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE DWELLING KNOWN AS 6429 LIVINGSTON ROAD, APT. 101, OXON HILL, MARYLAND 20745 | **Case No.**  8:23-mj-02153 _____<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Special Agent Kelsey Wadsworth of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), Baltimore Field Division, Hyattsville II Field Office, Greenbelt, Maryland, being duly sworn, depose and state as follows:

1.      I am an "investigative or law enforcement officer of the United States" within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18.  I make this Affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the dwelling known as 6429 Livingston Road, Apt. 101, Oxon Hill, Maryland, 20745 (the "**Target Location**"), as described in Attachment A, for the items described in Attachment B.  The search will include searching for cell phones (including, but not limited to, the device(s) with the cell phone number(s) (240) 837-3110 and (240) 698-9199 or other computer devices believed to be used by **Lester MASSEY, Jr.** ("**MASSEY**") (collectively, the "**Target Devices**").  Based on the investigation to date, **MASSEY** utilizes Instagram Accounts **silverbackless** and **hotshotless** and the Facebook account name **lester.massey.73** (collectively referred to hereafter as the "**Social Media Accounts**").

2.      I submit there is probable cause to believe that the **Target Location** will contain evidence of federal firearms crimes such as violations of Title 18, United States Code, Section

USA_0180

922(g)(1) (Felon in Possession of a Firearm and Ammunition), 922(a)(1) (Engaging in the Firearms Business Without a License), 922(d) (Sale or Transfer to a Prohibited Person), and 933 (Trafficking in Firearms) (collectively, the "**Target Offenses**"), including on the **Target Devices**. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that the **Target Offenses** have been committed by **MASSEY** and others.  There is accordingly probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband, and/or fruits of these crimes as further described in Attachment B.

3.      Because this affidavit is being submitted for the limited purpose of establishing probable cause for the requested search warrant, I have not included each and every fact known to me from the investigation.  Rather, I have set forth only those facts that I believe are necessary to establish probable cause for the requested warrant.  I have not, however, excluded any information known to me that would defeat a determination of probable cause.

4.      The statements made in this affidavit are based on:  (a) my personal participation in this investigation; (b) information provided to me by other law enforcement officers; (c) information provided to me and other law enforcement officers by confidential sources of information; (d) criminal history records maintained by various law enforcement agencies, including the National Criminal Information Center ("NCIC"); and (e) the training and experience of myself and other law enforcement agents and officers.

## YOUR AFFIANT

5.      I have been an ATF Special Agent since April 2021 and have attended the Federal Law Enforcement Training Center Criminal Investigation Training Program and the ATF Academy's Special Agent Basic Training Program for a combined period of 27 weeks.  I have received extensive formal and on-the-job training in the provisions of the Federal Firearms Laws

USA_0181

administered under Title 18 and Title 26 of the United States Code.  I have assisted in numerous investigations involving violations of the Federal Firearms and Controlled Substances Laws.  I have received specialized training regarding, and have personally participated in, various types of investigative activities, including, but not limited to:  (a) physical surveillance; (b) the debriefing of defendants, witnesses, informants, and other individuals who have knowledge concerning violations of Federal Firearms Laws; (c) the execution of search warrants; (d) the consensual monitoring and recording of conversations; (e) electronic surveillance through the use of pen registers and trap and trace devices; and (f) the handling and maintenance of evidence.

6.      I have overseen controlled purchases of firearms and drugs, as well as conducted street level surveillance of firearm and drug transactions; utilized informants to make controlled purchases of firearms and drugs; targeted street level and interstate firearms and narcotics traffickers; and obtained and executed search warrants as a result of firearm and drug investigations.  As a result, I have extensive experience in working with confidential informants and persons with direct experience with the methods used to distribute firearms and controlled substances.

7.      Based on my training and experience, I am familiar with the means and methods that Prohibited Persons use to obtain firearms and how they often use firearms in furtherance of other violations of federal law.  I have also become knowledgeable about the criminal statutes of the United States, particularly in the area of the law relating to violations of the Federal Firearms Laws, narcotics, and conspiracy.

8.      Because of this training and experience, I have learned about the illicit trade of firearms and how individuals circumvent the legal means of obtaining firearms to avoid detection by law enforcement.  I have learned that thefts from Federal Firearms Licensees, Straw Purchasing,

USA_0182

secondary market sales, and manufacturing of Privately Made Firearms ("PMFs") are all methods prohibited individuals use to obtain firearms. As a result of these experiences, I have become familiar with the use of telephones and applications used by prohibited persons to communicate, the patterns of activity that firearms traffickers employ, the types and amounts of profits made from firearms sales, and the methods, language, and terms that are used to disguise the source and nature of the profits of illegal firearms possession and trafficking. Additionally, I have learned that applications with messaging capability offer end-to-end encryption and are often utilized for firearms transactions taking place in illicit markets or when one or more parties to the transaction are prohibited from possessing firearms.

9.      Based on my knowledge, training, and experience, I know that illegal possessors of firearms and ammunition often acquire those firearms and ammunition in names other than their own to avoid detection by government agencies and law enforcement. Even though these firearms are obtained in other people's names, the unlawful possessors actually own and continue to use these firearms and exercise dominion and control over them and related accessories. I know that illegal possessors of firearms and ammunition commonly maintain books, records, receipts, notes, ledgers, or other papers related to the transportation, ordering, sale, distribution and acquisition of firearms, ammunition, and related accessories. I know through my training and experience that illegal possessors of firearms and ammunition often will store the above-mentioned books, records, receipts, notes, ledgers, and other papers related to the transportation, ordering, sale, distribution and acquisition of firearms, ammunition, and related accessories in digital format on their computers or cellular phones. They commonly will take and keep photographs of firearms and ammunition in their possession or in digital format on their computers and/or cellular phones. I know through my training and experience that illegal possessors of firearms and ammunition often

4

USA_0183

will use their computers or cell phones to acquire firearms, ammunition, and related accessories for their possession through the internet. The process for such acquisitions regularly includes internet and social media searches and communications, among other methods.

10.     Based on my knowledge, training, and experience, I know that individuals involved with firearms offenses frequently use cellular telephones and communication devices such as social media sites, like Instagram, to further their illegal activities. Based upon my knowledge, training, experience, and participation in this and other firearms investigations, I know the following:

a.     Prohibited Persons and those who engage in firearms offenses often use cellular telephones and social media sites, like Instagram, to communicate with co-conspirators. Records of these communications, including the communications themselves, are often stored on these cell phones or on these social media sites.

b.     Prohibited Persons and those who engage in firearms offenses often use cellular telephones and other digital storage devices as well as social media sites, like Instagram, to maintain "contact lists" of individuals who may have assisted in the planning of their criminal activity.

c.     Prohibited Persons and those who engage in firearms offenses frequently take photographs of their co-conspirators and themselves holding drugs, handguns, or other weapons. These pictures may be stored on cell phones or posted to social media sites, like Instagram.

11.     I know through my training and experience that individuals who deal in or otherwise sell firearms or are "engaged in the business of dealing or selling firearms" for a profit are required to hold a Federal Firearms License, or FFL, which must be applied for and approved

USA_0184

by the ATF.  Additionally, I know that for an individual to obtain an FFL, they must not be prohibited from possessing a firearm due to a prior felony conviction or due to being an abuser of any controlled substances, among other bases.

### GENERAL INFORMATION REGARDING INSTAGRAM AND ITS USE

12.     From a review of publicly available information provided by Instagram about its service, including Instagram's "Privacy Policy," I am aware of the following about Instagram and about the information collected and retained by Instagram and its parent company Meta Platforms, Inc. ("Meta"):

a.     Meta owns and operates a free access social networking website, Instagram, which can be accessed at http://www.instagram.com.  Instagram allows its users to create their own profile pages, which can include a short biography, a photo of themselves, and other information.  Users can access Instagram through the Instagram website or by using a special electronic application, or "app," created by the company that allows users to access the service through a mobile device such as a cellular telephone.

b.     Instagram permits users to post photos to their profiles on Instagram and otherwise share photos with others on Instagram, as well as other social-media services, including Duo, Facebook, and Twitter.  When posting or sharing a photo on Instagram, a user can add a caption to the photo, can add various "tags" to the photo that can be used to search for the photo, can add location information to the photo, and can add other information to the photo, as well as apply a variety of "filters" or other visual effects that can be used to modify the look of the posted photos.  In addition, Instagram allows users to make comments on posted photos, including photos that the user posts or photos posted by other users of Instagram.  Users can also "like" photos.

USA_0185

c.      The Instagram "app" for mobile devices also allows users to send private messages to one or more people.  These messages can include text, photos, videos, or locations. Instagram calls this feature "Instagram Direct," and it is sometimes referred to colloquially as "direct messaging," or "dm" for short.

d.      Instagram allows users to post and share various types of user content, including photos, comments, and other materials.

## PROBABLE CAUSE

13.      I have learned through the course of my investigation into **MASSEY** that **MASSEY** is prohibited from possessing firearms due to the following convictions to which he was sentenced to a year or more in prison:

- 2008 – Possession with Intent to Distribute Controlled Dangerous Substance – sentenced to 18 months' confinement (Maryland);

- 2012 – Possession of Controlled Dangerous Substances – sentenced to 48 months' imprisonment, 36 suspended, and 36 months of supervised release (Maryland).

14.      I have also reviewed relevant ATF and Maryland records and confirmed that **MASSEY** has never been a licensed firearm importer, licensed firearm manufacturer, nor licensed firearm dealer, or FFL.

15.      During this investigation, I have learned that **MASSEY** utilizes the **Social Media Accounts** and the **Target Devices** which, for the reasons discussed below, I believe will be located at the **Target Location**.

16.      Based on my training and experience, I know that determining a firearm to be a firearm through a photograph can be difficult; a firearm can be difficult to distinguish from a prop or toy.  The screen shots below are from actual videos displayed on the **Social Media Accounts**.

7

USA_0186

During these videos described below I have observed the firearms function and cycle as I have learned, during my training and experience, firearms would.  The actions on the firearms cycle, eject spent brass casings, and expel projectiles.  In some videos, the angle allows me to observe the fine movement of the index finger depressing the trigger.  Many of the targets fired upon in these videos are metallic and provide an immediate audible "plink" feedback when impacted by a metallic projectile striking their surface, which is consistent with these being depictions of actual firearms.

### Public Posts from MASSEY's Social Media Accounts

17.     Based on the investigation conducted to date, on or about August 8, 2023, **MASSEY** publicly posted to his **silverbackless** Instagram account a video with a short video clip that begins with the text, "described him as one of the most dangerous men on the face of the earth" with a matching narration, followed by images of **MASSEY** lifting heavy weights, **MASSEY** with a small female child, and **MASSEY** holding a tan semi-automatic pistol at an outdoor range.   The post included the hashtags #Dmv #gaming #bodybuildingmotivation #guntraining #love #suitland and the text "follow for more...."

USA_0187



18.    On or around May 16, 2023, **MASSEY** publicly posted to his **silverbackless** Instagram account a video of him firing what appears to be a similar tan semi-automatic pistol at an outdoor range viewed in previous posts on his **Social Media Accounts**.  Based on its appearance and geolocation data associated with similar Instagram posts discussed in greater detail below, I believe this location is not an official firing range and instead is likely an outdoor space on an associate's property.  Based on my training and experience, I know that individuals who are prohibited from owning firearms due to their criminal records are not lawfully permitted

9

to utilize official firing ranges and often utilize unregulated or unofficial firing ranges to avoid this restriction.  This video post includes the hashtags #guns #dmv #fitnesslifestyle #trainingday and caption "follow for more."  In the following screenshot of this video **MASSEY** can be seen holding the tan semi-automatic pistol in his right hand and a cellular telephone in his left hand.



In the following screenshot from the same video, **MASSEY** can be seen firing the tan semi-automatic pistol:

USA_0189



19.     A review of **MASSEY**'s public posts to the **Social Media Accounts** show additional video posts of him shooting firearms at what appears to be the same outdoor location posted in or around January 2023.

20.     For example, on January 1, 2023, **MASSEY** appears to have posted videos of himself shooting a variety of firearms on Instagram and Facebook.  The Facebook livestream video is approximately 13 minutes long and an approximately 3-minute excerpt was posted on

USA_0190

**MASSEY**'s **silverbackless** Instagram page.



**lester.massey.73** *(Facebook)*          **silverbackless**[1] *(Instagram)*

21.     An Instagram search warrant, discussed in greater detail below, identified a third

video (screenshot below) from the **silverbackless** account, as well:

---

[1]     This screenshot is taken from a copy of the video recovered pursuant to an Instagram search
warrant.

USA_0191



*Screenshot from video recovered during search warrant.*

22.     Based on the associated metadata for these three videos, the 13-minute livestream from **MASSEY**'s Facebook account was created on or about January 1, 2023, at approximately 10:29 a.m. Eastern Standard Time[2] ("EST"), and the three-minute clip on Instagram was created on or about January 1, 2023, at approximately 10:46 a.m. EST.  The third video which included an image of **MASSEY** holding a firearm up to the camera lens was created on or about January 1, 2023, at approximately 10:47 a.m. EST.  Based on the proximity in the timeframes, **MASSEY** wearing similar clothing, hat, and shoes, and the background of the blue tarp and tree line, I believe that the videos these screenshots depict were generated on the same day around the same time.

23.     Furthermore, geolocation data associated with each of these three January 1, 2023,

---

[2]     The timestamps referenced in this application have been converted from Coordinated Universal Time to Eastern Standard Time or Eastern Daylight Times, as applicable.  Based on my training and experience, this conversion can produce a one-hour variance at times.

USA_0192

videos identified the videos as having been created in a rural location in Davidsonville, Maryland.

A Google Maps satellite image plotting this data showed the following:



I have reviewed Maryland State records of all licensed shooting ranges in Anne Arundel County, Maryland, and none are located in Davidsonville, Maryland.  As mentioned above, based on his criminal record, **MASSEY** is prohibited from possessing firearms and ammunition and this prohibition prevents **MASSEY** from patronizing official firing ranges.

24.      Additionally, on or about October 9, 2022, **MASSEY** posted a video to the **silverbackless** Instagram page of himself sitting in the front passenger seat of a Sport Utility Vehicle or Jeep while simultaneously firing a tan semi-automatic pistol out the window with one hand.  This video post included the hashtags:  #gunplay, #shooting, #training, and #berrttaapx [sic].  I know from my training and experience that Beretta USA Corp. manufactures a model APX

14

USA_0193

firearm that is a semi-automatic pistol and that those pistols are sold in a Flat Dark Earth ("FDE") model which appears tan in color.  The same day, an individual utilizing the Instagram account name █████████ messaged **MASSEY**, "Oh yea u @ the range."



15

**Prior Search Warrant for MASSEY's Social Media Accounts Obtained**

25.     On or about January 17, 2023, the Honorable Ajmel A. Quereshi, United States Magistrate Judge for the District of Maryland, issued a warrant authorizing law enforcement to obtain stored information related to **MASSEY**'s two Instagram accounts and Facebook account from Meta (as mentioned above, referred to herein as the **Social Media Accounts**).

26.     Pursuant to the above-mentioned search warrant, I received and reviewed data relating to **MASSEY**'s **Social Media Accounts** which, in part, identified that the accounts were accessed by several devices including, during the time period from August 9, 2021, to January 17, 2023:

- SM-S906U – Samsung Galaxy S22+

- SM-S908U – Samsung Galaxy S22 Ultra

- SM-A805N – Samsung Galaxy A80

- SM-T738U – Samsung Galaxy Tab S7 FE

- SM-N960N – Samsung Galaxy Note 9

- ASUS_Z01QD – ROG Phone

- SM-F711U – Samsung Galaxy Z Flip3

**MASSEY's Firearms Sale in the Vicinity of the Target Location**

27.     A review of **MASSEY**'s **lester.massey.73** Facebook account data pursuant to the **Social Media Accounts** search warrant revealed that **MASSEY** sold a firearm on or about September 4, 2021 to an individual utilizing Facebook account ██████████ (hereinafter, ██████████. Below is a brief excerpt of that conversation:

██████████ :     Can i get one of dem shorties tho?

**MASSEY**:     6 n u can

16

▮▮▮▮▮▮  :   I got 5 right now how u gonna act

**MASSEY**:   Can't act Need 6 my ppls joints

▮▮▮▮▮▮  :   Ok fuck it i got it u gonna pull up on me ?

The chat continues and includes a discussion of an in-person meeting, as mentioned below.

28.     Based on my training and experience, I believe that **MASSEY** is conducting the sale of a firearm on behalf of a third party.  I know an unregistered pistol can be purchased within a price range of $100-1,400 depending on the history of the firearm and the condition.  Here, I believe that when ▮▮▮▮▮▮ asked for a "shorties," I believe ▮▮▮▮▮▮ was referring to the short barrel size of the firearm.  **MASSEY**'s reference to "6" is a reference to $600 and ▮▮▮▮▮▮ is counteroffering $500.  **MASSEY** declines and says that he cannot transact at that price, explaining that the item at issue is "my ppls joints."

29.     Based on my training and experience, I believe when **MASSEY** states "my ppls joints" he is telling ▮▮▮▮▮▮ that the firearm belongs to a close friend or associate or family member.  I have come to learn that "my people," or in this case, "my ppls" is common street vernacular for close family and friends.  I also know that "joints" is common street vernacular for firearms.

30.     **MASSEY** then sent ▮▮▮▮▮▮ a photograph of a Beretta APX Carry firearm, a subcompact firearm meant for concealed carry.  The same photograph includes a blue gun lock inside a clear plastic bag marked "Beretta."  I know that firearms manufacturers commonly provide branded accessories, including gun locks, with new firearms.

USA_0196



31.      According to the Facebook messages, it appears that ████████ purchased the firearm from **MASSEY** in the parking lot of **MASSEY**'s building. ████████ proposed a different meeting location and the following conversation occurred:

> **MASSEY**:  Shit not driving out there cuz
>
> ████████:  Where u
>
> **MASSEY**:  Oxon hill
>
> ████████:  U want me come to u?
>
> ████████:  Or u wanna meet at home depot?
>
> **MASSEY**:  Me
>
> ████████:  Ok fool shoot me da addy ill pull up right fast

USA_0197

MASSEY:    6425 Livingston rd[3]

█████:    Ok cuz i b der in a lil ima stop at 7-11 And b der

MASSEY:    On the side of the building

█████:    Huh

MASSEY:    U will know what I'm talking about when u pull up

█████:    Oh bet

█████:    Im out here cuz

32.    Based on physical surveillance and my review of street maps, I believe that **MASSEY** was directing ███████ to the area nearby the **Target Location** when **MASSEY** provided the address "6425 Livingston rd" and the direction "[o]n the side of the building." Further, based on my training and experience, I believe **MASSEY** was directing ███████ to the vicinity of the **Target Location** so **MASSEY** would not have to travel a meaningful distance with the firearm, or reveal his true address to ███████.  Based on my training and experience, I know that illegal firearms transactions are often made in locations where the individual selling the firearm believes the risk of law enforcement surveillance or intervention is low, while also not necessarily revealing exactly where the firearm(s) are being stored.

33.    On or about September 9, 2021, ███████ contacted **MASSEY** again and asked:

█████:    Yo u got some more if so how many

█████:    Jesus

█████:    Waz guddy fool fool holla at me when u get a lil min

MASSEY:    OK

---

[3]    6425 Livingston Road in Oxon Hill, Maryland is in the same building complex as the building that houses the **Target Location** and is approximately 700 feet from the **Target Location**.

USA_0198

**MASSEY**:     2028672917

34.     Based on my training and experience I believe that ██████ was inquiring to **MASSEY** about purchasing more firearms when he said, "…u got some more if so how many?" In response, **MASSEY** provides one of **MASSEY**'s cellular phone numbers to Jenkins to continue the conversation.  Based on my training and experience, I believe **MASSEY** may have done this to allow for further discussion of future gun sales without leaving a written record on Facebook.

<u>**Prior Search Warrant for MASSEY's Associate's Phones**</u>

35.     On or about January 17, 2023, the Honorable Ajmel A. Quereshi, United States Magistrate Judge for the District of Maryland, issued a warrant authorizing law enforcement to search two cellular telephones that belonged to ████████████████, an individual who has been identified as an associate of **MASSEY** (collectively, ███████████).

36.     On or about October 27, 2022, law enforcement officers from the Drug Enforcement Administration ("DEA") and the Prince George's County Police Department ("PGPD") executed a court-ordered search and seizure warrant at ████████'s residence, ████ ████████████████████████.  During the execution of the warrant, several items were recovered from the master bedroom, including:

- ████████████████;

- A loaded Beretta 96D, .40 S&W caliber, semi-automatic pistol;

- A loaded Beretta APX, 9x19mm caliber, semi-automatic pistol;

- Approximately 128 ounces of suspected phencyclidine ("PCP"); and

- Approximately $8,712 in United States Currency.

████████was arrested and further investigation by law enforcement confirmed that ████████ was prohibited from possessing firearms and ammunition due to previous felony convictions at

USA_0199

the time of this arrest.

37.     On or about January 25, 2023, ████████ was indicted federally on the following charges:  21 U.S.C. § 841(a)(1) – Possession with Intent to Distribute a Controlled Substance; 18 U.S.C. § 924(c)(1)(A) – Possession of Firearms in Furtherance of a Drug Trafficking Crime; and 18 U.S.C. § 922(g)(1) – Felon in Possession of Firearms and Ammunition (████████████ ████).

38.     Pursuant to the search warrant for ████████████, I have reviewed downloads from ████████████ and observed more than 200 telephonic communications between ████████ and **MASSEY** during the period of approximately August 2, 2021, through October 25, 2022.

### November 2021 MASSEY and ████████ Firearms Transaction(s)

39.     A search of ████████████ revealed that on or around November 13, 2021, a video had been sent by **MASSEY** to ████████ utilizing the Google Duo application.[4]  The video (screenshots below) appears to show a black and silver firearm on the leg of an individual and three additional firearms on the floor while an adult male says, "Deuce, deuce.  Two fifty. Twenty two for two fifty shorty."  Based on my training and experience, I know that a "deuce" or a "deuce, deuce" is common slang for a .22 caliber firearm.  Here, I believe that by sending this video to ████████ **MASSEY** is offering to sell ████████ a .22 caliber firearm for $250 and the inclusion of other firearms in the background suggests **MASSEY** has additional firearms

---

[4]     Google Duo was a voice over IP and videotelephony application that also included a file sharing feature.  In 2022, Google Duo was merged into the Google Meet application.  Google Duo provides users end-to-end encryption and allows voice and video calling between Android and Apple's iOS.  Based on my training and experience, I know that illegal arms traffickers and other criminals utilize applications that offer end-to-end encryption, for example WhatsApp, to communicate in an effort to shield their criminal communications from law enforcement.

USA_0200

available for sale.



*Screenshots from the "deuce deuce video."*

40.     On or about November 20, 2021, **MASSEY** shared the following photo of a tan

firearm which appears, based on my training and experience, to be a Beretta APX with ███████

via Google Duo:

22

USA_0201



Given the manner in which the Google Duo activity log is displayed, I am unable able tell precisely when the above picture was shared by **MASSEY**, but the photograph's metadata shows that it was created on or about November 20, 2021, at approximately 11:36 a.m. EST.

41.    Approximately two minutes after the above photo was created, at approximately 11:38 a.m. on or about November 20, 2021, ▇▇▇▇▇▇ appears to have taken a screenshot of the above photograph while utilizing Google Duo:

USA_0202



42.     I believe this is true based, in part, on the time stamp in the top left corner of the screenshot, the green circle around the time stamp that typically indicates either the camera or the camera and the microphone are being used by an iPhone[5], and because the three circular icons are consistent with Google Duo controls.

43.     During my review of extracts from ███████████, I reviewed text messages between ████████ and a third party stored in ████████'s phone as ████████████. From approximately July 30, 2021, through November 17, 2021, ████████ and ████████'s text messages are limited to arranging three separate in-person meetings.  The last in-person meeting appears to have taken place on or about November 17, 2021.  On or about November 18, 2021, ████████ texted ████████, "Yo what's up bro, i'm still trying to get one of those things we was

---

[5]     ██████████████ are both iPhones.

USA_0203

talking about yesterday.   Might be ready now[.]"   On or about November 20, 2021 at approximately 11:29 EST, ███████ texted a copy of the above screenshot of the tan firearm (which had been sent to him by **MASSEY**) to ███████.   Below is an excerpt of the conversation that followed:

███████ :   Ok bet

███████ :   On the way back.  I just passed Philly

███████ :   Ok my nigga

███████ :   The GPS says I'm 30 minutes out from your spot

███████ :   Omw

███████ :   Ok pull up to the spot

███████ :   By the tire spot right?

███████ :   Yes good year

███████ :   About to pull up in like five minutes bro.

███████ :   Ok I'm right here

44.    Based on my training and experience, I know that individuals engaged in unlawful firearms transactions often use guarded or cryptic language in an effort to shield their illicit dealings from law enforcement's detection.  Here, when ███████ stated, "i'm still trying to get one of those things we was talking about yesterday," I believe ███████ is referring to an in-person conversation between ███████ and ███████ during which ███████ stated a desire to acquire a firearm from ███████.  Additionally, I know that ███████ response ,"Ok bet" is a common slang phrase that conveys agreement and acceptance.   I believe the subsequent messages are consistent with ███████ and ███████ meeting in person to complete the previously discussed firearms transaction for the tan firearm.

25

45.     Based on **MASSEY**'s sharing of the initial photo of the tan firearm with

█████████, █████████ subsequently sharing the photo with █████████, and the apparent

completion of a firearms transaction between █████████ and █████████, I believe that **MASSEY**

helped facilitate this firearms transaction to █████████ or sold the firearm first to █████████, who

then sold it to █████████.



**March 2022 MASSEY and █████████  Firearms Transaction**

46.     I have also reviewed an extraction from █████████████ which I believe is

consistent with an additional firearms transaction.  Specifically, on or about March 26, 2022,

█████████ texted **MASSEY**, "A cuz how much would you hit me for three of them cuz" and

**MASSEY** responded to █████████ "14 no lower."[6]  Here, when █████████ asked "how much

would you hit me for three of them," I believe █████████ is using guarded language to ask

**MASSEY** the cost of three firearms and **MASSEY**'s answer of "14 no lower" means the price is

no less than $1,400.  Based on my training and experience, I know this price would fall within the

market rate for three unregistered pistols depending on the condition of the firearms.

**Attempts to Locate MASSEY and the Target Devices**

47.     On or about February 7, 2023, law enforcement began conducting surveillance in

efforts to locate **MASSEY** at, or in the vicinity of, the **Target Location**.  On or about February 8,

2023, law enforcement made unsuccessful efforts to observe **MASSEY** at varying times during

the day at the **Target Location**.  During the months of February and March 2023, law enforcement

again conducted surveillance at varying times of day and was unable to observe **MASSEY** entering

---

[6]     For context, the preceding text message had been a link to a seemingly non-pertinent Tik-Tok video sent by **MASSEY** to █████████ on or about March 16, 2022, and the subsequent text message had been a link to a second non-pertinent Tik-Tok video sent by **MASSEY** to █████████ on or about April 8, 2022.

USA_0205

or exiting a specific apartment, although law enforcement was able to observe vehicles associated with **MASSEY** through Maryland Motor Vehicle Administration records parked at or near the apartment complex.

48.     As mentioned above, on or about May 16, 2023, the Forest Heights Police Department performed a traffic stop on **MASSEY**, which occurred in the vicinity of the intersection of Oxon Hill Road and Livingston Road in Oxon Hill, Maryland.  The basis for the stop was a fully tinted front windshield on a black 2006 Acura sedan bearing the Virginia registration TSE6944 ("**VA Acura**") which was being operated by **MASSEY**.  **MASSEY** advised law enforcement that he did not have an active insurance policy on the vehicle and **MASSEY** was arrested for knowingly operating an uninsured motor vehicle on a public roadway.  As mentioned above, **MASSEY** provided the telephone number associated with the **Target Cell Phone** to officers during processing and provided officers with the **Target Location** address.  This Acura is registered to an address in Suitland, Maryland.[7]

49.     On or about June 15, 2023, law enforcement received a legal process return from Gates Hudson Property Management Company, the mangers of the apartment complex that houses the **Target Location**.  This return revealed that **MASSEY** is on a month-to-month lease and paid rent for his apartment on or about June 15, 2023.  **MASSEY** has been the lease holder for that apartment since approximately October 15, 2020.  Law enforcement conducted physical surveillance of this location on or about June 14, 2023, June 15, 2023, and June 20, 2023, but did not observe **MASSEY**.

---

[7] I know from my training and experience that firearm and narcotics traffickers will use family or friends' addresses to register vehicles to conceal their true residences and thwart law enforcement efforts to locate them.

USA_0206

50.     I have also reviewed Maryland Motor Vehicle Administration records and **MASSEY** has a valid driver's license that lists the **Target Location** as his address.  Additionally, Maryland Department of Labor, Licensing & Regulation Employment History records show that **MASSEY** has previously claimed unemployment while using the **Target Location** as his address.

### Cell Phone Location Data and Cell Site Simulator Results

51.     On July 31, 2023, the Honorable Timothy J. Sullivan issued warrants authorizing a search of historic cell phone location data, the collection of prospective cell phone location data, and the use of a cell site simulator for the cellular device associated with (240) 837-3110 ("**-3110 Phone**"), one of the **Target Devices**.

52.     Pursuant to the warrant for prospective cell phone location data, the **-3110 Phone**'s service provider began sharing the real time cell phone location data for this phone on or about August 1, 2023.  This location data showed that the **-3110 Phone** was regularly within approximately 3,340 meters of the **Target Location** based on the **-3110 Phone**'s connections with nearby cell phone towers.

53.     Furthermore, on or about August 4, 2023, at approximately 10:54 a.m., law enforcement utilized a cell site simulator and determined that the **-3110 Phone** was within the building that houses the **Target Location**.  Approximately nine minutes later, law enforcement observed **MASSEY** exit the building that houses the **Target Location**, enter the **VA Acura**, and leave the immediate area.  I then reviewed the **-3110 Phone**'s real time cell phone location data which showed the **-3110 Phone** leaving the vicinity of the **Target Location** and subsequently traveling north.

USA_0207

54.     On or about August 7, 2023, at approximately 08:45 a.m., law enforcement again confirmed through physical surveillance and cell phone location data that **MASSEY** and the **-3110 Phone** were present at the **Target Location**.

## UNLOCKING BIOMETRICALLY SECURED DEVICES

55.     The warrant for the **Target Location** would permit law enforcement to obtain from certain individuals the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to the above-referenced warrant.  I seek this authority based on the following:

56.     I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password.  These biometric features include fingerprint scanners and facial recognition features.  Some devices offer only one of these features, while others offer a combination of these features, and the user(s) of such devices can select which features they would like to utilize.

57.     If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints.  For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device.  Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device.  The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

USA_0208

58.     If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face.  For example, Apple offers a facial recognition feature called "Face ID."  During the Face ID registration process, the user holds the device in front of his or her face.  The device's front-facing camera then analyzes and records data based on the user's facial characteristics.  The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face.  Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

59.     In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password.  Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents.  This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

60.     As discussed in this affidavit, I believe that one or more digital devices will be found during the search.  The passcode(s) or password(s) that would unlock the devices subject to search are not known to law enforcement.  Thus, law enforcement personnel may not otherwise be able to access the data contained within the devices, making the use of biometric features necessary to the execution of the search authorized by this warrant.

61.     I also know from my training and experience, as well as from information found in publicly available materials, including those published by device manufacturers, that biometric features will not unlock a device in some circumstances, even if such features are enabled.  This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period

30

of time.  For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) the device has not been unlocked using a fingerprint for four hours and the passcode or password has not been entered in the last 156 hours.  Biometric features from other brands carry similar restrictions.  Thus, in the event that law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

62.     In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device.  However, in my training and experience, I know that, in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device.

63.     Accordingly, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the requested warrant would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of **MASSEY** to the fingerprint scanner of the device(s); and (2) hold the device(s) in front of the face of the same individual and activate the facial recognition feature, for the purpose of attempting to unlock the device(s) in order to search the contents as authorized by the warrant.

## COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS

64.     As described above and in Attachment B, this affidavit seeks permission to search for evidence, fruits, contraband, and/or instrumentalities of the **Target Offenses** committed by **MASSEY** and others that might be found in the **Target Location**, in whatever form they are

31

found.  One form in which such items might be found is data stored on one or more digital devices. Such devices include any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop computers, laptop computers, notebooks, and tablet computers; wireless communication devices, such as mobile telephones and smart phones; digital cameras; peripheral input/output devices such as keyboards, printers, scanners, monitors, and drives intended for removable media; related communications devices; and storage media, including specifically the **Target Devices** mentioned above.  Thus, the warrant applied for would authorize the seizure of the **Target Devices** or, potentially, the copying of stored information, all under Federal Rule of Criminal Procedure 41(e)(2)(B).  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that, if **Target Devices** are found in the **Target Location,** there is probable cause to believe that the items described in Attachment B will be stored in the **Target Devices** for at least the following reasons:

   a.   Individuals who engage in criminal activity, including drug and firearms trafficking, use digital devices, like the **Target Devices**, to access websites to facilitate illegal activity and to communicate with co-conspirators online; to store on digital devices, like the **Target Devices**, documents and records relating to their illegal activity, which can include logs of online chats with co-conspirators and/or purchasers; email correspondence; text or other "Short Message Service" ("SMS") messages; contact information of co-conspirators and/or purchasers, including telephone numbers, email addresses, identifiers for instant messaging and social medial accounts; stolen financial and personal identification data, including bank account numbers, credit card numbers, and names, addresses, telephone numbers, and social security numbers of other individuals; and records of illegal transactions using stolen financial and personal identification

USA_0211

data, to, among other things, (1) keep track of co-conspirators' and/or purchasers' contact information; (2) keep a record of illegal transactions for future reference; (3) keep an accounting of illegal proceeds for purposes of, among other things, splitting those proceeds with co-conspirators; and (4) store stolen data for future exploitation.

        b.        Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

        c.        Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet. Electronic files downloaded to a digital device can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensic tools. When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space—for long periods of time before they are overwritten. In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet

USA_0212

pages.  Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

65.     As further described in Attachment B, this affidavit seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that establishes how the digital device(s) were used, the purpose of their use, who used them (or did not), and when.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in any of the **Target Devices** at issue here because:

a.     Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well.  In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the **Target Devices** are, as described further in the attachment, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole.  Digital data stored in the **Target Devices**, not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave digital data on a hard drive that show what tasks

34

USA_0213

and processes on a digital device were recently used.  Web browsers, email programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use.  Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.  Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

b.      Forensic evidence on a digital device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information, configuration files, user profiles, email, email address books, chats, instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

c.      A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how such digital devices were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be

35

USA_0214

sought, digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

      e.      Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device. For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

      f.      There is probable cause to believe **MASSEY** uses digital devices to facilitate his firearms trafficking operation. I know that when an individual uses a digital device to commit crimes, such as the **Target Offenses**, the individual's device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. From my training and experience, I believe that a digital device used to commit a crime of this type may contain data that is evidence of how the digital device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense and the identities of those perpetrating it.

## METHODS TO BE USED TO SEARCH DIGITAL DEVICES

66.      Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

USA_0215

a.      Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today.  Digital devices—whether, for example, desktop computers, mobile devices, or portable storage devices—may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise.  As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.      Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

c.      Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence

37

USA_0216

of particular data or software on a digital device is not segregable from the digital device itself. Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment and can require substantial time.

        d.      Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear as though the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms. Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches. Some applications for computers, smart phones, and other digital devices do not store data as searchable text; rather, the data is saved in a proprietary non-text format. Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography, a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously

USA_0217

followed.  A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband, or instrumentalities of a crime.

        e.     Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software.  The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device.  Additionally, most smart phones and other mobile devices require passwords for access.  For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode.  Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer.  Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many.  For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

        f.     Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete.  Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected

USA_0218

time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices.  In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

## CONCLUSION

67.    Based upon the information set forth in this affidavit, there is probable cause to search the **Target Location** for evidence, fruits, and/or instrumentalities of the commission of the Target Offenses by **MASSEY** and others, including but not limited to evidence on the **Target Devices**.  Accordingly, I respectfully request that this Court issue a search warrant for the **Target Location** as described in Attachment A for the purpose of seizing the items particularly described in Attachment B.

Respectfully submitted,

Digitally signed by KELSEY
WADSWORTH
Date: 2023.08.09 16:19:00
-04'00'

_____
Kelsey Wadsworth
Special Agent, ATF

Affidavit submitted by email and attested to me as true and accurate by telephone consistent with Fed. R. Crim. P. 4.1 and 41(d)(3) this _____ day of _____, 2023.

_____
The Honorable Timothy J. Sullivan
United States Magistrate Judge

40

USA_0219

**<u>ATTACHMENT A</u>**
**Property to Be Searched**

The **Target Location** is 6429 Livingston Road, Apt. 101, Oxon Hill, Maryland, 20745.

The **Target Location** is located within a four-story brick multi-residence apartment complex.  The

buildings are marked by a large green awning depicting in white lettering "6429."  Unit 101 is

located on the bottom landing (two-levels below the entrance) with a blue door to the right.



USA_0220

**ATTACHMENT B**
**Particular Things to be Seized**

1.      All records relating to violations of 18 U.S.C. § 922(g)(1) (Felon in Possession of a Firearm and Ammunition), 922(a)(1) (Engaging in the Firearms Business Without a License), 922(d) (Sale or Transfer to a Prohibited Person), and 933 (Trafficking in Firearms) (collectively, the "**Target Offenses**"), from January 1, 2021, through the Present, and evidence, contraband, fruits, or instrumentalities of such violations committed by persons known and unknown, including:

        a.      Weapons, handguns, and ammunition, as well as items pertaining to the possession or use of firearms, including body armor, gun cases, ammunition magazines, holsters, spare parts for firearms, firearms cleaning equipment, photographs of firearms or of persons in possession of firearms, receipts for the purchase and/or repair of all these items, and firearm paraphernalia;

        b.      All photos and videos of the same and any/all communications pertaining thereto;

        c.      All records and information pertaining to the transportation, ordering, purchase, and transfer of firearms and ammunition and the identity of the parties to the transaction;

        d.      Documents related to or memorializing the ordering, purchasing, storage, transportation and sale of firearms, including U.S. currency used in the purchase and sale of firearms, buyer lists, seller lists, pay-owe sheets and records of sales, log books, firearm ledgers, personal telephone/address books of customers and suppliers, rolodexes, telephone answering pads, bank and financial records, records relating to domestic and foreign travel such as tickets, passports, visas, credit card receipts, travel schedules, receipts and records,

trucker log books and storage records, such as storage locker receipts and safety deposit box rental records;

e.      Receipts or records from any gun store, shooting range, or other location associated with the possession or use of any firearm;

f.      Any and all bank records, including both records of any accounts or transactions within the traditional banking or credit systems or via cryptocurrencies;

g.      Personal identifying information of individuals other than the individual(s) specifically residing at the premises being searched, including Social Security numbers, identification numbers, dates of birth, addresses and telephone numbers, debit card information, credit reports, bank or other financial institution information, and records referring or relating to such information;

h.      Mail matter and shipping packages, opened or unopened, not addressed to or from the premises being searched and/or the individual(s) specifically residing at the premises;

i.      Any and all clothing, shoes and other personal effects providing evidence of the commission of the **Target Offenses**;

j.      Records or items containing indicia of occupancy, residency, ownership, or other connection to the location being searched, such as leases, utility bills, identity documents, and cancelled mail;

k.      Records relating to wealth or the movement of wealth such as brokerage and financial institution statements, wire transfers, currency exchanges, deposit slips, cashier's checks, and/or other financial documents related to depository bank accounts, lines of credit, credit card accounts, real estate mortgage initial purchase loans or loan

USA_0222

refinances, residential property leases, escrow accounts, the purchase, sale, or leasing of automobiles or real estate, or auto loans, and investments, or showing or referring to purchases or transactions for more than $300;

l.      All financial and banking data, records, information, and communications, including but not limited to bank statements, account documents, receipts, cashier's checks, checks, commissions transfer of funds by any means, deposits, money orders withdrawals, the use of email connected to financial transactions, account numbers, and other items evidencing the obtaining, secreting, transferring, concealment, and/or expenditure of money;

m.     United States and foreign currency over $1,000 or bearer instruments worth over $1,000 (including cashier's checks, traveler's checks, certificates of deposit, stock certificates, cash, checks, money orders, and bonds) (including the first $1,000), and data, records, documents, or information (including electronic mail, messages over applications and social media, and photographs) pertaining to obtaining, possessing, using, applying for, or transferring money over $1,000;

n.      Digital currency, such as Bitcoin, stored on electronic wallets, other forms of wallets, or other means, cryptocurrency (or digital currency) private keys, and digital currency recovery seeds;

o.      All records pertaining to transactions in Bitcoin or other digital or cryptocurrency, and encryption key information related to ownership of Bitcoins and other digital or cryptocurrency as well as related documents and programs and packing material or inserts relating to any transactions with any cash-for-cryptocurrency exchange;

p.      Documents and records showing email and telephone contacts and numbers

USA_0223

called, such as SIM cards, address books, call histories, and telephone bills;

      q.      Indicia of occupancy, residency, and/or ownership of premises, vehicles, and other property, including utility and telephone bills, canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, envelopes, registration, receipts, and keys which tend to show the identities of the occupants, residents, and/or owners;

      r.      Any and all notes, documents, records, or correspondence, whether in written or electronic form, pertaining to the **Target Offenses**;

      s.      Photographs and/or videos, in particular photographs and/or videos of potential co-conspirators and their criminal associates and/or criminal activities, and associated geographical location, related to the **Target Offenses**;

      t.      Records pertaining to legitimate income or lack thereof, such as payroll documents, employer information, and income and expense records;

      u.      Documents and records reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with co-conspirators, including calendars, address books, telephone or other contact lists, logs, pay/owe records, distribution or customer lists, correspondence, receipts, notes, and other records noting amounts, whether contained in hard copy correspondence, notes, emails, text messages, photographs, videos (including items stored on digital devices), or otherwise, as well as records of incoming and outgoing voice communications; records of incoming and outgoing text messages; records of incoming and outgoing emails; the content of incoming and outgoing text messages and emails; voicemails; voice recordings; and associated geographic location data;

4

USA_0224

v.      Records of browsing history, internet searches, search terms, and search results, and associated geographic location, related to the **Target Offenses**;

w.      Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any digital device and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

x.      Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any digital devices and which relate to the **Target Offenses**;

y.      Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Google Duo, Google Meet, Facebook, Facebook Messenger, Instagram, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the **Target Offenses**;

z.      Contents of any calendar or date book; and

2.      Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the **Target Offenses**, including but not limited to the device(s) with the cell phone number(s) (240) 837-3110 and (240) 698-9199 or other computer devices believed to be used by **Lester MASSEY, Jr.**

3.      For any digital device, cellular telephone, computer, or storage medium whose seizure is otherwise authorized by this warrant, and any digital device, cellular telephone,

USA_0225

computer, or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "digital device" or "device"):

     a.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat" and instant messaging logs, photographs, and correspondence;

     b.    evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

     c.    evidence indicating how and when the device was accessed or used, to determine the chronological context of device access, use, and events relating to the crime(s) under investigation and to the device user(s);

     d.    evidence indicating the device user's state of mind as it relates to the crime(s) under investigation;

     e.    evidence of the attachment to the computer, cellular phone, or other device of other storage devices or similar containers for electronic evidence;

     f.    evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

     g.    evidence of the times the device was used;

     h.    passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

USA_0226

i.      applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of the device;

j.      records of or information about Internet Protocol addresses used by the device;

k.      records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

l.      contextual information necessary to understand the evidence described in this attachment.

4.      Routers, modems, and network equipment used to connect devices to the Internet.

As used above, the terms "records," "documents," and "information" include all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The terms "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

The term "computer," "device," or "digital device" includes all types of electronic, magnetic, optical, electrochemical, or other high-speed data processing devices performing logical, arithmetic, or storage functions, including server computers; network hardware; central

USA_0227

processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, data security devices, videotapes, video recording devices, and other magnetic or optical media.

5.     With respect to the search of any of the items described above which are stored in the form of magnetic or electronic coding on computer media or on media capable of being read by a computer with the aid of computer-related equipment (including CDs, DVDs, thumb drives, flash drives, hard disk drives, or removable digital storage media, software, or memory in any form), the search procedure may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein, while permitting government examination of all the data necessary to determine whether that data falls within the items to be seized):

a.     surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for markings it contains and opening a drawer believed to contain pertinent files);

USA_0228

b.       "opening" or cursorily reading the first few "pages" of such files in order to determine their precise contents;

c.       "scanning" storage areas to discover and possibly recover recently deleted files;

d.       "scanning" storage areas for deliberately hidden files; or

e.       performing key word searches or other search and retrieval searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

If after performing these procedures, the directories, files or storage areas do not reveal evidence of the specified criminal activity, the further search of that particular directory, file, or storage area shall cease.

6.       With respect to the search of all information obtained pursuant to this warrant, law enforcement personnel will make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, communications, or other electronically stored information that are identified with particularity in the warrant while minimizing the review of information not within the list of items to be seized as set forth herein, to the extent reasonably practicable.  If the government identifies any seized communications that may implicate the attorney-client privilege, law enforcement personnel will discontinue its review and take appropriate steps to segregate all potentially privileged information so as to protect it from substantive review.  The investigative team will take no further steps regarding any review of information so segregated absent further order of the Court.  The investigative team may continue to review any information not segregated as potentially privileged.

USA_0229