**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

United States

v.                                          No. PX-24-041

Lester Massey, Jr.

**Motion to Dismiss the Indictment**
**Under the Second Amendment**

On February 8, 2024, a grand jury returned a one-count indictment charging Lester Massey ("Mr. Massey") with being a felon in possession ammunition, in violation of 18 U.S.C. § 922(g)(1). (ECF No. 1.) Mr. Massey, through the undersigned counsel, now moves to dismiss the indictment as violative of his Second Amendment right to keep and bear arms.

Under *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1, 17 (2022), courts assess Second Amendment challenges by asking (1) whether the Second Amendment's "plain text" covers an individual's conduct, and if so, (2) whether the government has carried the heavy burden of showing that a challenged law is "consistent with this Nation's historical tradition of firearm regulation." At *Bruen* step one, Mr. Massey falls comfortably within the protections of the Second Amendment: the ammunition described in the indictment is essential to the exercise of the fundamental right to keep and bear arms; and as a United States citizen,

1

Mr. Massey is among "the people" protected by the amendment. At *Bruen* step two, the government will be unable to demonstrate that § 922(g)(1) is consistent with America's tradition of firearms regulation. No statute like § 922(g)(1) appeared anywhere in the United States until the 20th century—too late for *Bruen* purposes—and the government cannot carry its burden by relying on a (supposed) tradition of disarming "dangerous" or "untrustworthy" groups, as Bruen requires courts and to conduct the historical analysis at a much lower level of generality. Finally, *Bruen* abrogated prior Fourth Circuit law rejecting Second Amendment challenges to § 922(g)(1).

Because § 922(g)(1) violates the Second Amendment, both facially and as applied to Mr. Massey, the Court should dismiss the indictment.

## I.  Legal background

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." In *District of Columbia v. Heller*, 554 U.S. 570, 577 (2008), the Supreme Court held the amendment protects an individual right to possess firearms "unconnected with service in a militia." The Court therefore struck down District of Columbia statutes that prohibited the possession of handguns in the home and required that any other guns in the home be kept inoperable. *Id.* at 628-34.

Following *Heller*, the lower federal courts developed a two-step test for evaluating Second Amendment claims. The "first question" under that test was "whether [a] challenged law impose[d] a burden on conduct falling within the scope of the Second Amendment's guarantee," as understood "at the time of ratification" in 1791. *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010). If it did not, then "the challenged law [wa]s valid." *Id.* But if the statute did burden conduct that was historically "understood to be within the scope of the

right," courts "move[d] to the second step," which involved "applying an appropriate form of means-end scrutiny." *Id.* Under either intermediate or strict scrutiny, courts weighed the government's interest in regulating firearms against the claimant's interest in exercising his right to keep and bear arms. *See United States v. Hosford*, 843 F.3d 161, 168 (4th Cir. 2016).

In *Bruen*, the Supreme Court disavowed this "judge-empowering interest-balancing inquiry." 597 U.S. at 22. *Bruen* held that rather than "applying means-end scrutiny in the Second Amendment context," courts should employ a "text-and-history standard." *Id.* at 19, 39.

That standard consists of two steps. At step one, a court asks whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 17. If not, the challenge fails. But if the conduct does fall within the Second Amendment's plain text, then "the Constitution presumptively protects that conduct." *Id.* A statute proscribing such conduct is unconstitutional unless the government, at step two, "demonstrate[s] that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* The "burden falls on [the government] to show" that a statute fits within America's tradition of firearms regulation. *Id.* at 33-34. To carry that burden, the government must point to "historical precedent" that "evinces a comparable tradition of regulation." *Id.* at 27. If "no such tradition" exists, then the statute being challenged is unconstitutional. *Id.*; *see also id.* at 17 ("Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.").

The Court explained that "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Id.* at 34 (emphasis in original). For that reason, the relevant "historical tradition" for purposes of a federal gun regulation is that which

3

existed in 1791, when the Second Amendment was ratified. *See id.* at 34, 37. Courts may look to the tradition of firearms regulation "before . . . and even after the founding," but they should do so with care. *Id.* at 27. *Bruen* cautioned, for example, that "[h]istorical evidence that long predates [1791] may not illuminate the scope of the [Second Amendment] right if linguistic or legal conventions changed in the intervening years." *Id.* at 34. Courts should not "rely on an ancient practice that had become obsolete in England at the time of the adoption of the Constitution and never was acted upon or accepted in the colonies." *Id.* at 35.

Conversely, courts must "guard against giving post-enactment history more weight than it can rightly bear." *Id.* Evidence "of how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century represent[s] a critical tool of constitutional interpretation." *Id.* But the farther forward in time one goes from 1791, the less probative historical evidence becomes. *See id.* at 36 ("As we recognized in *Heller* itself, because post-Civil War discussions of the right to keep and bear arms took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources."). In particular, evidence from "the mid- to late-19th-century . . . come[s] too late to provide insight into the meaning of the Constitution in 17[91]." *Id.* at 37. Courts should therefore credit such history to the extent it provides "confirmation" of prior practice but should otherwise afford it little weight. *Id.* That is because "post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id.* at 36 (emphasis in original); *see also id.* at 66 n.28 (ignoring "20th-century historical evidence" because it is too temporally remote from ratification).

The Court in *Bruen* applied this two-step test to a New York law providing that, to obtain a permit to carry a concealed handgun in public, an applicant had to demonstrate "proper cause," i.e., "a special need for self-protection distinguishable from that of the general community." *Id.* at 12. At step one, it was "undisputed" that the petitioners were "part of 'the people' whom the Second Amendment protects" and that handguns qualify as protected "Arms." *Id.* at 32. The Court also "ha[d] little difficulty concluding" that the petitioners' "proposed course of conduct—carrying handguns publicly for self-defense"—constituted "bear[ing]" arms. *Id.* As the Court explained, the "definition of 'bear' naturally encompasses public carry," and "[n]othing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms." *Id.* The Second Amendment therefore "presumptively guarantee[d]" a right to carry firearms in public, and New York's "proper cause" requirement, which infringed that right, could pass constitutional muster only if the state overcame the presumption. *Id.* at 33-34.

At step two, the Supreme Court held that because New York had failed to identify a robust historical tradition of regulations similar to the proper-cause requirement, the state's statute violated the Second Amendment. *Id.* at 33-70. In reaching its conclusion, the Court did not elaborate a comprehensive scheme for evaluating historical evidence, but it did stake certain guideposts for lower courts to follow.

### A. Statutes addressing longstanding societal problems are subject to more rigorous scrutiny than statutes addressing historically "unprecedented" challenges.

To begin, the Court explained that the standard for reviewing historical evidence differs depending on what kind of problem a statute is intended to remedy—specifically, whether that problem is old or new.

In "some cases," where a challenged statute "addresses a general societal problem that has persisted since the 18th century," the historical "inquiry will be fairly straightforward." *Id.* at 26; *see also id.* at 27 (describing inquiry as "simple" and "straightforward"). To defend such statutes, the government must point to a tradition of "distinctly similar historical regulation[s]." *Id.* at 26. If "the Founders themselves could have adopted" a particular regulation to "confront" a problem that existed in 1791, but did not do so, then that regulation is unconstitutional today. *Id.* at 27. Similarly, statutes addressing longstanding problems are likely unconstitutional if (1) "earlier generations addressed the societal problem, but did so through materially different means," or (2) some jurisdictions in the Founding era attempted to enact laws analogous to the challenged regulation, but "those proposals were rejected on constitutional grounds." *Id.* at 26-27.

In "other cases," a modern statute will be aimed at "unprecedented societal concerns or dramatic technological changes" that would have been "unimaginable at the founding." *Id.* at 27-28. Challenges to these statutes "may require a more nuanced approach." *Id.* at 27. Instead of asking whether the modern statute and historical precursors are "*distinctly* similar," courts should ask whether they are "*relevantly* similar." *Id.* at 29 (emphasis added).

*Bruen* did not "provide an exhaustive survey of the features" that render a modern statute and a historical analogue sufficiently similar. *Id.* at 29. But it did identify "at least two metrics" to guide courts under both the "distinctly similar" and "relevantly similar" standards: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* In other words, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense [the 'how'] and whether that burden

is comparably justified [the 'why'] are central considerations when engaging in an analogical inquiry." *Id.* (emphasis omitted).

The second approach to *Bruen*'s historical inquiry—the "relevantly similar" standard—is less difficult for the government to satisfy, since it does not require as tight a fit between modern and historical regulations as the "distinctly similar" standard does. But courts may employ the more-permissive "relevantly similar" test only when the challenged statute is geared toward a societal problem that was "unimaginable at the founding." *Id.* at 28. It is not available when the challenged statute "addresses a general societal problem that has persisted since the 18th century." *Id.* at 26; *see, e.g.*, *Range v. Att'y Gen.*, 69 F.4th 96, 103 (3d Cir. 2023) (en banc) ("To be compatible with the Second Amendment, regulations targeting longstanding problems must be 'distinctly similar' to a historical analogue. But 'modern regulations that were unimaginable at the founding' need only be 'relevantly similar' to one.").

At the threshold, therefore, courts faced with a Second Amendment challenge must identify the problem at which a statute is aimed, and then determine whether that problem existed in 1791 or instead grows out of "unprecedented," "unimaginable" societal changes. *Bruen*, 597 U.S. at 27-28. The answer to this question dictates whether courts apply the "distinctly similar" test or the "relevantly similar" test. *See United States v. Daniels*, 77 F.4th 337, 343 (5th Cir. 2023) ("Before we decide whether § 922(g)(3) is consistent with our tradition of gun regulation, we must first ask a methodological question: What kind of similarity are we looking for? 'Distinct' similarity or a less precise 'relevant' similarity? That depends on whether § 922(g)(3) 'addresses a general societal problem that has persisted since the 18th century' or an 'unprecedented societal concern' that the Founding generation

did not experience."); *United States v. Duarte*, ___ F.4th ___, 2024 WL 2068016, at *14 (9th Cir. May 9, 2024) (subjecting § 922(g)(1) to "distinctly similar" analysis because statute "takes aim at 'gun violence' generally, which is a 'problem that has persisted in this country since the 18th century'").

### B.   The government must identify a "well-established and representative" tradition of comparable regulations.

Whether based on "distinctly similar" precursors or merely "relevantly similar" historical analogues, the "comparable tradition of regulation" must be robust. To carry its burden, the government must show that the historical tradition on which it relies is "well-established and representative." *Bruen*, 597 U.S. at 40; *see also id.* at 36 (explaining that "a governmental practice" can "guide [courts'] interpretation of an ambiguous constitutional provision" *if* that practice "has been open, widespread, and unchallenged since the early days of the Republic").

A handful of "outlier[]" statutes or cases from a few "outlier jurisdictions" do not make out a historical tradition. *Id.* at 30, 60. The *Bruen* Court expressed "doubt," for instance, that statutes from only three of the original thirteen colonies would establish a relevant tradition. *Id.* at 46. And in evaluating 19th-century "surety laws," which New York argued were precursors to its proper-cause requirement, the Court discounted two of those ten laws—which were most similar to New York's—as unrepresentative. *See id.* at 56 n.24; *see also Atkinson v. Garland*, 70 F.4th 1018, 1029 (7th Cir. 2023) (Wood, J., dissenting) ("[T]he historical analogues must be abundant, though they need not appear in every jurisdiction.").

## II.   Analysis

### A.   Section 922(g)(1) fails *Bruen*'s "text-and-history" standard.

The federal felon-in-possession statute prohibits firearm possession by "any person" "who has been convicted in any court of[] a crime punishable by imprisonment for a term

exceeding one year." § 922(g)(1). Under the framework announced in *Bruen*, § 922(g)(1) violates Mr. Massey's Second Amendment right to keep and bear arms, both on its face and as applied. As an American citizen, Mr. Massey is one of "the people" protected by the Second Amendment's plain text, and a statute prohibiting him from possessing firearms and ammunition therefore presumptively violates the Second Amendment. The government will be unable to rebut that presumption. Felons' access to firearms is "a general societal problem that has persisted since the 18th century," and so the government must show a robust tradition of regulations "distinctly similar" to § 922(g)(1). *Bruen*, 597 U.S. 26. Felon-disarmament statutes, however, did not appear until the 20th century; the "Founders themselves could have adopted" felon-disarmament laws, but did not do so. *Id.* at 27. Because there was no historical tradition, circa 1791, of regulations "distinctly similar" to § 922(g)(1), that statute violates the Second Amendment, both on its face and as applied to Mr. Massey. *Id.* at 26.

### 1.    The Second Amendment's "plain text" protects Mr. Massey's possession of ammunition.

*Bruen* directs courts to begin by asking whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 17. This inquiry breaks down into three questions: "whether 'the Second Amendment's plain text covers' (1) the individual, (2) the type of arm, and (3) the 'proposed course of conduct' that are at issue." *Duarte*, 2024 WL 2068016, at *9 (quoting *Bruen*, 597 U.S. at 19). Mr. Massey satisfies all three requirements.

### a.    "Arms"

While ammunition, it is not "explicitly protect[ed]" by the Second Amendment's text, "without bullets, the right to bear arms would be meaningless. A regulation eliminating a person's ability to obtain or use ammunition could thereby make it impossible to use firearms for their core purpose." *Jackson v. City & Cty. of S.F.*, 746 F.3d 953, 967 (9th Cir. 2014).

For that reason, "the right to possess firearms for protection implies a corresponding right to obtain the bullets necessary to use them," *id.*, and courts "have consistently held," both before and after *Bruen*, that "ammunition is protected by the Second Amendment," *N.Y. State Firearms Ass'n v. James*, 2024 WL 1932050, at *5 (W.D.N.Y. May 2, 2024); *see also, e.g.*, *United States v. Posada*, 670 F. Supp. 3d 402, 407 (W.D. Tex. 2023); *United States v. DaSilva*, 2022 WL 17242870, at *5 (M.D. Pa. Nov. 23, 2022).

### b.      "Keep and bear"

Possession of a Second Amendment-protected item, the conduct alleged in the indictment, easily qualifies as "keep[ing]" arms. *Heller* defined "keep" as "to retain; not to lose," "to have in custody," and "to hold; to retain in one's power or possession"—in short, to "have weapons." *Id.* at 582.

### c.      "The people"

Finally, Mr. Massey is part of "the people" protected by the Second Amendment. Construing the words "the people," the *Heller* Court said "the term unambiguously refers to *all* members of the political community, *not an unspecified subset*." 554 U.S. at 580 (emphasis added). It interpreted "the people" to refer to all "persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Id.* Thus the Second Amendment right, *Heller* said, "is exercised individually and belongs to *all* Americans." *Id.* at 581 (emphasis added).

It follows that even "dangerous felons"—and Mr. Massey is *not* a felon—"are indisputably part of 'the people'" for Second Amendment purposes. *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1046 (11th Cir. 2022); *see also, e.g.*, *Range*, 69 F.4th at 101-03 (holding, post-*Bruen*, that felons are among "the people" safeguarded by the Second Amendment); *Duarte*, 2024 WL 2068016, at *9-13 (same); *United States v. Bullock*, 679 F.

Supp. 3d 501, 525-26 (S.D. Miss. 2023) (same); *United States v. Melendrez-Machado*, 677

F. Supp. 3d 623, 628-30 (W.D. Tex. 2023) (same); *United States v. Ware*, 673 F. Supp. 3d

947, 954-56 (S.D. Ill. 2023) (same); *United States v. Martin*, 2023 WL 1767161, at *2 (D.

Vt. Feb. 3, 2023) (same); *United States v. Barber*, 2023 WL 1073667, at *6 (E.D. Tex. Jan.

27, 2023) (same); *Campiti v. Garland*, 649 F. Supp. 3d 1, 3 (D. Conn. 2023) (same); *United

States v. Goins*, 647 F. Supp. 3d 538, 544-48 (E.D. Ky. 2022) (same); *United States v.

Carrero*, 635 F. Supp. 3d 1210, 1212 (D. Utah 2022) (same); *United States v. Coombes*, 629

F. Supp. 3d 1149, 1154-56 (N.D. Okla. 2022) (same); *United States v. Hernandez*, 678 F.

Supp. 3d 850, 854-55 (N.D. Tex. 2023) (same); *United States v. Holmes*, 2023 WL 4494340,

at *1 (E.D. Mich. July 12, 2023) (same); *United States v. Davila*, ___ F. Supp. 3d ___, 2023

WL 5361799, at *2 (S.D.N.Y. Aug. 22, 2023) (same); *United States v. Gates*, 2023 WL

5748362, at *4-5 (N.D. Ill. Sept. 6, 2023) (same).

In addition, *Heller* explained that "the people" is a "term of art" that bears a uniform

meaning across the First, Second, Fourth, and Ninth Amendments. 554 U.S. at 580. The

result is that, if a felony conviction deprives someone of his Second Amendment right to

keep and bear arms, it would also deprive him of his First Amendment right to petition the

government for redress of grievances and his Fourth Amendment right to be free from

warrantless searches of his home. Like the en banc Third Circuit in *Range*, this Court should

reject that proposition. 69 F.4th at 102 ("Unless the meaning of the phrase 'the people' varies

from provision to provision—and the Supreme Court in *Heller* suggested it does not—to

conclude that Range is not among 'the people' for Second Amendment purposes would

exclude him from those rights as well."); *see also, e.g.*, *United States v. Williams*, 2022 WL

11

18285005, at *2 (N.D. Ga. Nov. 14, 2022) (same); *United States v. Williams*, 2023 WL 8355891, at *4 (S.D.N.Y. Dec. 1, 2023) (same).

Notwithstanding this straightforward interpretation of the Second Amendment's "plain text," the government has argued in other cases that "the people" comprises only *law-abiding* and *responsible* people. This argument primarily relies, not on the text of the Second Amendment, but on *Bruen*, in which the petitioners' "pleadings" alleged they were "law-abiding" citizens. 597 U.S. at 15. It is true that at several points, *Bruen* describes the petitioners as "law-abiding" or "responsible." *E.g.*, *id.* at 71 ("New York's proper-cause requirement violates the [Second] Amendment in that it prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms.").

But "the criminal histories of the plaintiffs in [*Bruen*] were not at issue" in that case, *Range*, 69 F.4th at 101, since it was "undisputed" that the plaintiffs were "part of 'the people,'" *Bruen*, 597 U.S. at 31. The Court in *Bruen* therefore had no occasion to opine on whether the Second Amendment excludes the non-law-abiding or irresponsible from its reach. As the Ninth Circuit has held, it is "inconceivable" that "the Supreme Court, without any textual or historical analysis of the Second Amendment, intended to decide the constitutional fate of so large a population in so few words and with such little guidance." *Duarte*, 2024 WL 2068016, at *8.

Thus "*Bruen*'s scattered references to 'law-abiding' and 'responsible' citizens did not implicitly decide" whether supposedly non-law-abiding or irresponsible people, such as felons, are among "the people." *Id.*; *see also, e.g.*, *Range*, 69 F.4th at 101 (rejecting government's proposed "law-abiding, responsible citizens" gloss on "the people"); *United States v. Lewis*, 682 F. Supp. 3d 1038, 1048 (S.D. Ala. 2023) ("*Bruen* [did not] purport[] to

12

confine the Second Amendment to law-abiding, responsible citizens. It had no need, and perhaps no ability, to issue such a holding, since the individual plaintiffs were undisputedly 'ordinary, law-abiding' adult citizens."); *United States v. Pierre*, No. 1:22-cr-20321-JEM, ECF 53 at 17 (S.D. Fla. Nov. 28, 2022) ("[I]t is no surprise that [*Bruen*] used the term 'law-abiding' because that was the factual scenario the Court was considering. Indeed, there would have been no reason for the Court in *Bruen* to address or even consider whether non-law-abiding citizens were part 'of the people.' It did not, and *Bruen*'s references to 'law abiding' do not support the Government's position."); *Ware*, 673 F. Supp. 3d at 956 ("The language 'law-abiding' as used in both *Heller* and *Bruen* does not alter who the Second Amendment applies to, but rather describes the individuals involved in those cases."); *United States v. Williams*, ___ F. Supp. 3d ___, 2024 WL 731932, at *10 (E.D. Mich. Feb. 22, 2024) ("'[N]either *Heller* nor *Bruen* involved the issue of felons, much less the issue of the Second Amendment's textual scope as it applies to felons. So, while the Supreme Court in both cases referred to law-abiding citizens in discussing the Second Amendment's scope, it did not *hold* in either case that 'the people' was limited to law-abiding people. Put another way, the Court did not hold in either case that non-law-abiding felons were outside the scope of the Second Amendment's plain text.'" (emphasis in original) (quoting *United States v. Calhoun*, ___ F. Supp. 3d ___, 2024 WL 36977, at *7 (N.D. Ill. Jan. 3, 2024))).

Indeed, *Bruen* reaffirmed *Heller*'s conclusion that the Second Amendment right belongs to "'*all* Americans.'" 597 U.S. at 80 (emphasis added) (quoting *Heller*, 554 U.S. at 581). That statement cannot be reconciled with the view that *Bruen* (implicitly) limits the arms right to law-abiding, responsible citizens. *See Duarte*, 2024 WL 2068016, at *5 ("*Heller* defined 'the people' in the broadest of terms: the phrase 'unambiguously referred' to 'all

Americans,' not 'an unspecified subset.' More importantly, *Bruen* ratified that broad definition, quoting *Heller*'s language directly to hold that 'the Second Amendment guarantees to "*all Americans*" the right to bear commonly used arms in public.'" (emphasis in *Duarte*)).

Regardless, the government's argument proves too much. *Bruen* held "that *ordinary*, law-abiding citizens have [the] right to carry handguns publicly for their self-defense." 597 U.S. at 9 (emphasis added). If the word "law-abiding" in that sentence limits the Second Amendment's scope, then the word "ordinary" must do so, too. But surely the government does not believe *un*ordinary citizens lack Second Amendment rights. The Supreme Court cannot have meant to exclude anyone deemed abnormal—whatever that means—from exercising a fundamental, enumerated constitutional right.

Finally, "the phrase 'law-abiding, responsible citizens' is as expansive as it is vague." *Range*, 69 F.4th at 102; *accord Duarte*, 2024 WL 2068016, at *8 (same). "A phrase that malleable cannot be the peg that the Court references to determine who falls within or beyond the protections guaranteed by the Constitution." *United States v. Coleman*, ___ F. Supp. 3d ___, 2023 WL 6690935, at *6 (E.D. Va. Oct. 12, 2023); *see also Bullock*, 679 F. Supp. 3d at 535 ("[T]he phrase 'law-abiding, responsible citizens' is hopelessly vague."). As the Fifth Circuit has observed, that phrase

> admits to no true limiting principle. Under the Government's reading, Congress could remove 'unordinary' or 'irresponsible' or 'non-law-abiding' people—however expediently defined—from the scope of the Second Amendment. Could speeders be stripped of their right to keep and bear arms? Political nonconformists? People who do not recycle or drive an electric vehicle? One easily gets the point: Neither *Heller* nor *Bruen* countenances such a malleable scope of the Second Amendment's protections; to the contrary, the Supreme Court has made clear that "the Second Amendment right is exercised individually and belongs to all Americans." *Heller*, 554 U.S. at 581.

14

*United States v. Rahimi*, 61 F.4th 443, 453 (5th Cir. 2023). Thus, adopting a "law-abiding, responsible citizens" limitation "devolves authority to legislators to decide whom to exclude from 'the people.'" *Range*, 69 F.4th at 102. That approach—which "gives legislatures unreviewable power to manipulate the Second Amendment by choosing a label"—conflicts with *Bruen*'s "warning against 'judicial deference to legislative interest balancing.'" *Id.* at 103 (quoting 597 U.S. at 26).

### 2. The government will be unable to show that § 922(g)(1) is consistent with the United States' historical tradition of firearm regulation.

Because "the Second Amendment's plain text covers Mr. Massey's conduct, the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 17. To rebut the presumption, the government must establish that § 922(g)(1) "is consistent with this Nation's historical tradition of firearm regulation." *Id.* The government will be unable to do so. Section 922(g)(1) is therefore unconstitutional, both on its face and as applied to Mr. Massey.

### a. The "distinctly similar" test applies in a challenge to § 922(g)(1).

As explained above, the threshold question in *Bruen*'s historical inquiry is whether the problem addressed by § 922(g)(1) is longstanding or of more recent provenance. However one defines the problem addressed by § 922(g)(1)—felons' access to firearms, use of guns to commit crime, etc.—the answer to *Bruen*'s question is clear: the "general societal problem" at which § 922(g)(1) is directed "has persisted since the 18th century." *Id.* at 26. As a result, § 922(g)(1) is unconstitutional unless the government shows a broad tradition of "distinctly similar" regulations circa 1791, when the Second Amendment was ratified. *Id.*

Although *Bruen* did not expressly define "distinctly similar," it indicated the standard is a stringent one. The only historical regulation *Bruen* identified as sufficiently similar to New York's proper-cause requirement was an 1871 Texas law forbidding "anyone from

'carrying on or about his person . . . any pistol . . . unless he has reasonable grounds for fearing an unlawful attack on his person.'" *Id.* at 64 (citing 1871 Tex. Gen. Laws § 1). This "reasonable grounds" requirement was essentially identical to New York courts' interpretation of that state's proper-cause standard. *See id.* at 12-13.

### b.   Section 922(g)(1) violates the Second Amendment on its face.

#### i.   Statutes "distinctly similar" to § 922(g)(1) did not appear until the 20th century.

Given the high degree of fit required by *Bruen*'s "distinctly similar" test, § 922(g)(1) is facially constitutional only if the government can identify a historical tradition of laws that denied firearms to *felons* as a class (or to some other class defined very similarly to felons). No such statutes appear in the 18th- or 19th-century record.

The "earliest version" of § 922(g)(1) was not enacted until 1938. *Range*, 69 F.4th at 104 (citing Federal Firearms Act, Pub. L. No. 75-785, §§ 1(6), 2(f), 52 Stat. 1250, 1250–51 (1938)). Likewise, scholars agree that no state passed a felon-in-possession ban until "the early part of the twentieth century." Carlton F.W. Larson, *Four Exceptions in Search of a Theory*, 60 Hastings L.J. 1371, 1376 (2009); *accord* C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J. L. & Pub. Pol'y 695, 708 (2009) (reaching same conclusion); Adam Winkler, Heller*'s Catch-22*, 56 UCLA L. Rev. 1551, 1563 (2009) (similar); Nelson Lund, *The Second Amendment,* Heller, *and Originalist Jurisprudence*, 56 UCLA L. Rev. 1343, 1357 (2009) (similar); Lawrence Rosenthal, *The Limits of Second Amendment Originalism and the Constitutional Case for Gun Control*, 92 Wash. U. L. Rev. 1187, 1211 (2015) (similar). In short, possession of a firearm by a felon "was a nonexistent crime in this country until the passage of the Federal Firearms Act of 1938." *Duarte*, 2024 WL 2068016, at *24.

The Court in *Bruen* said it would not even "address any of the 20th-century historical evidence brought to bear by respondents or their *amici*," since evidence of that type "does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." 597 U.S. at 66 n.28. Regulations of such recent vintage cannot establish a historical tradition unless they "confirm[]" earlier practice. *Id.* at 27. Here, they do not. The "Founders themselves could have adopted" laws like § 922(g)(1) to "confront" the "perceived societal problem" posed by felons' access to guns. *Id.* But they declined to do so, and that inaction indicates § 922(g)(1) "[i]s unconstitutional" on its face. *Id.*

Mr. Massey anticipates that, in its response, the government will attempt to carry its *Bruen*-step-two burden by arguing § 922(g)(1) is "relevantly similar" (rather than "distinctly similar") to various historical analogues. If the government makes that argument, Mr. Massey will address it in his reply.

Regardless of which standard applies, the government cannot shoulder its burden at *Bruen* step two. Section 922(g)(1) therefore violates the Second Amendment on its face. *See United States v. Neal*, ___ F. Supp. 3d ___, 2024 WL 833607, at *5 (N.D. Ill. Feb. 7, 2024) (Ellis, J.) (holding § 922(g)(1) facially unconstitutional); *United States v. Prince*, ___ F. Supp. 3d ___, 2023 WL 7220127, at *11 (N.D. Ill. Nov. 2, 2023) (Gettleman, J.) (same); *United States v. Taylor*, 2024 WL 245557, at *5 (S.D. Ill. Jan. 22, 2024) (same).

### ii. The government cannot define the relevant historical tradition at a high level of generality.

In previous *Bruen* litigation, the government has argued § 922(g)(1) is constitutional because it fits within a supposed historical tradition permitting legislatures to take firearms away from "dangerous," "untrustworthy," or "irresponsible" people, or people who demonstrated "disrespect for the law." The government generally seeks to support this

argument by citing Founding-era colonial statutes that (purportedly) disarmed groups deemed dangerous or untrustworthy, such as Catholics, Native Americans, free Blacks, enslaved people, and anyone who refused to swear a loyalty oath to the state. Based on these disparate regulations of discrete groups, the government deduces a broader principle: that the Second Amendment, as it was understood in 1791, did not protect members of *any* group whom a legislature might rationally deem "dangerous" or "irresponsible," even if that specific group (such as felons) was never disarmed at the Founding.

This argument operates at too high a level of generality. *Bruen* demonstrates that in carving out exceptions to "the Second Amendment's unqualified command," 597 U.S. at 17, courts should proceed cautiously, defining those exceptions narrowly and concretely, to ensure they are in fact consistent with America's historical tradition of firearm regulation.

To support its proper-cause requirement, New York relied on several English and early American firearms regulations that, in its view, demonstrated a general governmental power to regulate the public carrying of firearms. The Court, however, refused to treat those regulations as more than the sum of their parts. Although New York's cited regulations suggested the constitutionality of certain narrow, "well-defined" public-carry restrictions, the Court concluded they did not permit "broadly prohibiting" public carry in whatever way a legislature finds appropriate. *Id.* at 38. New York, in other words, could not derive a general, far-reaching power to proscribe public carry simply by cobbling together a handful of discrete, targeted laws that regulated public carry in limited and specific ways.

***First,*** New York cited the 1328 Statute of Northampton, which "provided that, with some exceptions, Englishmen could not 'come before the King's Justices, or other of the King's Ministers doing their office, with force and arms, nor bring no force in affray of the

peace, nor to go nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere.'" *Id.* at 40 (quoting 2 Edw. 3 c. 3 (1328)). New York pointed as well to colonial and early-republic statutes prohibiting similar conduct. *Id.* at 46-52. According to New York, these regulations demonstrated a "sweeping" governmental power to restrict public carry. *Id.* at 40. But the Court read the regulations as prohibiting only "bearing arms in a way that spreads 'fear' or 'terror' among the people." *Id.* at 50. And because those regulations prohibited only one particular manner of public carry, *id.* at 47, they did not establish that the Second Amendment "permit[s] *broad* prohibitions on *all* forms of public carry," *id.* at 50 (emphasis added).

**Second,** New York cited several statutes from "the early to mid-19th century" that "proscribed the concealed carry of pistols and other small weapons" in public. *Id.* at 52. New York argued these statutes demonstrated that states may "ban public carry altogether." *Id.* at 53. But again, the Court refused to endorse such a far-reaching reading of the historical record. State courts interpreting those statutes had held "concealed-carry prohibitions were constitutional only if they did not similarly prohibit *open* carry." *Id.* (emphasis in original). And the *Bruen* Court declined to conclude, based on the permissibility of restricting one "particular mode" of public carry (concealed), that states may enact a "*general* prohibition" on *all* modes of public carry (both concealed and open). *Id.* at 53-54 & n.19 (emphasis added).

**Third,** New York analogized its proper-cause requirement to mid-19th-century "surety statutes." *Id.* at 55. Those statutes provided that if someone carried a firearm in public and thereby placed others in reasonable fear of injury, he would have to "post a bond before publicly carrying a firearm" again, unless he could show he had "reasonable cause to fear an assault or other injury." *Id.* at 55-56. The Court rejected the comparison. Under surety statutes,

19

"everyone started out with robust carrying rights and only those reasonably accused were required to show a special need in order to avoid posting a bond." *Id.* at 57. New York's regime, by contrast, "presume[d] that individuals have *no* public carry right without a showing of heightened need." *Id.* at 56 (emphasis in original). From the fact that states may "provide financial incentives for responsible" public carry, the Court refused to conclude that other, historically unprecedented public-carry restrictions are permissible. *See id.* at 59.

And the Court held that, even in the aggregate, these regulations did not add up to a historical tradition of "broadly prohibit[ing]" all forms and manners of public carry. *Id.* at 70. The Court's historical survey revealed a few "well-defined" restrictions on public carry: those that limited "the intent for which one could carry arms" (to terrorize the people), "the manner of carry" (concealed vs. open), and "the exceptional circumstances under which one could not carry arms" (before government officials). *Id.* at 38. But that's all. New York could not extrapolate, from these specifics, a general power to regulate public carry more broadly, in historically unprecedented ways.

*Bruen* dooms any effort to carve out Second Amendment exceptions for all groups labeled "dangerous," "irresponsible," "untrustworthy," or "disrespectful of the law." As explained above, that effort relies on a handful of Founding-era statutes disarming specific groups (slaves, Native Americans, Catholics, and disloyal subjects), from which the government gleans the much broader principle that "dangerous" or "untrustworthy" groups, in general, do not enjoy the right to keep and bear arms. This is exactly the maneuver the Court rejected in *Bruen*: identify a few specific examples of conduct that historically has been constitutionally unprotected (e.g., carrying firearms "to terrorize the people," carrying concealed in states where open carry is permitted), move up the level-of-generality ladder to a

descriptor that unites these discrete examples (e.g., "public carry"), and then apply that umbrella term to *all* conduct that (arguably) falls in the broader category (e.g., publicly carrying without "proper cause").

As the Ninth Circuit has explained, relying on isolated Founding-era laws to conclude that legislatures may disarm any group whose "actions evince[] an unwillingness to comply with the l[aw]" is "far too generalized an abstraction to draw." *Duarte*, 2024 WL 2068016, at *16; *see also United States v. Harrison*, 654 F. Supp. 3d 1191, 1215 n.134 (W.D. Okla. 2023) (holding government cannot use this "trick" to disarm "whole new classes of people" who "aren't remotely the sort of persons that were historically regulated"); *Range*, 69 F.4th at 105 ("That Founding-era governments disarmed groups they distrusted like Loyalists, Native Americans, Quakers, Catholics, and Blacks does nothing to prove that Range is part of a similar group today. And any such analogy would be 'far too broad.'" (quoting *Bruen*, 597 U.S. at 31)); *cf. United States v. Power*, 2023 WL 131050, at *10 (D. Md. Jan. 9, 2023) ("As the Supreme Court cautioned, '[e]verything is similar in infinite ways to everything else.' So, the Court must avoid finding that analogies are 'relevantly similar' where the connection is overly superficial or general." (quoting *Bruen*, 597 U.S. at 29)).

In addition, the Second Amendment exceptions that this approach would produce are grossly overbroad. Categories like "dangerous" and "disrespectful of the law" are anything but "well-defined." *Bruen*, 597 U.S. at 38. Those labels are so malleable that, in the wrong hands, they could be applied to virtually any group of people—and thereby "eviscerate" the right to keep and bear arms. *Id.* at 31; *see Medina v. Whitaker*, 913 F.3d 152, 159-60 (D.C. Cir. 2019) (concluding "'dangerousness' standard" is too "amorphous . . . to delineate the scope of the Second Amendment"); *Kanter v. Barr*, 919 F.3d 437, 465 (7th Cir. 2019)

(Barrett, J., dissenting) ("The government could quickly swallow the [Second Amendment] right if it had broad power to designate any group as dangerous and thereby disqualify its members from having a gun.").

To defend § 922(g)(1), the government cannot rely on unbounded descriptors like "dangerous" and "untrustworthy." Instead, it must descend into particulars.

> **c.    Section 922(g)(1) violates the Second Amendment as applied to Mr. Massey.**

Assuming for sake of argument that § 922(g)(1) is facially constitutional, it nevertheless violates the Second Amendment as applied to Mr. Massey.

The pre-plea criminal history report prepared by the United States Probation Office indicates Mr. Massey has *no prior felony convictions*. His four prior convictions are all for state and local level misdemeanor offenses. His most recent conviction dates back more than 12 years. Even if the government can show a historical tradition that would justify disarming certain felons, it will be unable to demonstrate that, around the time of the Founding, there existed a "well-established and representative" tradition of disarming people convicted of misdemeanor offenses like Mr. Massey's. *Bruen*, 597 U.S. at 30.

Because the government cannot show that disarming people like Mr. Massey is consistent with America's tradition of firearm regulation, § 922(g)(1) violates the Second Amendment as applied. *See, e.g.*, *Duarte*, 2024 WL 2068016, at *2 (holding § 922(g)(1) unconstitutional as applied to defendant with convictions for being a felon in possession of a firearm, evading a peace officer, vandalism, and possessing a controlled substance); *United States v. Harper*, ___ F. Supp. 3d ___, 2023 WL 5672311, at *1, 12-13 (M.D. Pa. Sept. 1, 2023) (same: "at least thirteen prior felony" convictions, including "multiple armed robberies and drug trafficking convictions"); *Bullock*, 679 F. Supp. 3d at 506 & n.2 (same:

manslaughter, aggravated assault, fleeing law enforcement, and attempted aggravated assault of a law enforcement officer); *Williams*, 2024 WL 731932, at *1 n.2 (same: first- and second-degree murder); *United States v. Hostettler*, ___ F. Supp. 3d ___, 2024 WL 1548982, at *1-2 (N.D. Ohio Apr. 10, 2024) (same: carrying a concealed weapon, being a felon in possession of a firearm, possessing methamphetamine for the purpose of sale, aggravated possession of drugs, forgery, and receiving stolen property); *United States v. Jones*, 2024 WL 86491, at *2-3 (S.D. Miss. Jan. 8, 2024) (same: being a felon in possession of a firearm and "many felony drug offenses"); *United States v. Leblanc*, ___ F. Supp. 3d ___, 2023 WL 8756694, at *2 (M.D. La. Dec. 19, 2023) (same: theft in excess of $500, armed robbery, and illegal carrying of weapons); *United States v. Griffin*, ___ F. Supp. 3d ___, 2023 WL 8281564, at *9 (N.D. Ill. Nov. 30, 2023) (Coleman, J.) (same: robbery, criminal trespass, possession of controlled substances); *United States v. Forbis*, ___ F. Supp. 3d ___, 2023 WL 5971142, at *1 (N.D. Okla. Aug. 17, 2023) (same: possessing methamphetamine and driving under the influence).

### 3. Pre-*Bruen* Fourth Circuit case law does not foreclose Mr. Massey's claim.

In other *Bruen* litigation, the government has argued § 922(g)(1) remains constitutional because *Bruen* did not abrogate the Fourth Circuit's post-*Heller* case law upholding the statute. That view is mistaken. Understanding why requires some background. *See United States v. Banks*, 29 F.4th 168, 175 (4th Cir. 2022) ("[W]e need not follow precedent by a panel or by the court sitting en banc if the decision rests on authority that subsequently proves untenable considering Supreme Court decisions. Authority is untenable if its reasoning or holding is inconsistent with a Supreme Court decision.").

After completing its historical survey, and before assessing the constitutionality of

the District of Columbia's statutes, the Supreme Court in *Heller* inserted some "precautionary language" about the scope of its holding. *Tyler v. Hillsdale Cty. Sheriff's Dep't*, 837 F.3d 678, 688 (6th Cir. 2016) (en banc). The Court wrote that the Second Amendment right "is not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626. It went on:

> Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Id.* at 626-27. In an accompanying footnote, the Court described these prohibitions as "presumptively lawful regulatory measures." *Id.* at 627 n.26.

Following *Heller*, the Fourth Circuit in *Chester* laid out its two-step, means-ends inquiry for Second Amendment claims, which directed courts to ask (1) "whether [a] challenged law impose[d] a burden on conduct falling within the scope of the Second Amendment's guarantee," and if so, (2) whether that law survived either intermediate or strict scrutiny. 628 F.3d at 680-83. *Chester* involved 18 U.S.C. § 922(g)(9), which makes it illegal to possess a firearm after conviction for a "misdemeanor crime of domestic violence." *Id.* at 677. Two years later, in *United States v. Moore*, 666 F.3d 313 (4th Cir. 2012), the Fourth Circuit for the first time addressed a Second Amendment challenge to a statute—§ 922(g)(1)—that is among the "presumptively lawful regulatory measures" identified in *Heller*.

*Moore* noted that *Heller* said "'nothing in [the Supreme Court's] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons,'"

24

which *Heller* characterized as "'presumptively lawful regulatory measures.'" *Id.* at 317-18. The *Moore* court expressed confusion about this aspect of *Heller*, observing that it was "unclear . . . whether *Heller* was suggesting that 'longstanding prohibitions' such as these [felon-in-possession bans] were historically understood to be valid limitations on the right to bear arms or did not violate the Second Amendment for some other reason." *Id.* at 318. But the court felt no need to resolve that question. Because "the presumption of constitutionality . . . govern[ed]," the court did "not pursue an analysis of the historical scope of the Second Amendment right," as it otherwise would have at *Chester* step one. *United States v. Pruess*, 703 F.3d 242, 246 n.3 (4th Cir. 2012) (discussing *Moore*). Instead, the Fourth Circuit simply concluded "the *Chester* analysis is more streamlined when a presumptively lawful regulatory measure is under review." *Moore*, 666 F.3d at 318. Specifically, *Moore* held that *Heller*'s reference to "presumptively lawful" felon-disarmament laws "negates a facial challenge to a felon in possession statute like § 922(g)(1)." *Id.*

This conclusion rested solely on the "presumptively lawful" passage in *Heller*; it was not rooted in a *Chester*-step-one determination that felons are outside "the scope of the Second Amendment as historically understood." *Chester*, 628 F.3d at 680; *see Hamilton v. Pallozzi*, 848 F.3d 614, 624 (4th Cir. 2017) ("The streamlined portion of the analysis as explained in *Moore* is that for a presumptively lawful regulation, at the first step of the Second Amendment inquiry, we need not undertake an extensive historical inquiry to determine whether the conduct at issue was understood to be within the scope of the Second Amendment at the time of ratification.").

The nature of *Moore*'s analysis is crucial, as *Bruen* makes clear that uncritical deference to *Heller*'s "presumptively lawful" language is no longer proper. In the sentence before its reference to "longstanding prohibitions" on felons' possession of firearms, the *Heller* Court wrote that "the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues." 554 U.S. at 626. Fourteen years later, the Court in *Bruen* confronted a challenge to a New York law severely restricting the concealed carry of firearms in public—another of the "presumptively lawful" measures identified in *Heller*. *See United States v. Carter*, 669 F.3d 411, 415 (4th Cir. 2012) ("*Heller* lists several examples of what the Court deemed to be 'presumptively lawful regulatory measures,' including prohibitions on carrying concealed weapons.").

If *Heller*'s casual description of concealed-carry bans as constitutional were dispositive, *Bruen* would have been an easy case: the Court would simply have deferred to *Heller*'s approval of such laws and upheld New York's statute on that basis. But that is not what the Court did. The Court instead undertook an exhaustive historical survey of the law governing concealed carry, from medieval England up to late-19th-century America. 597 U.S. at 33-70. And "[a]t the end of th[at] long journey through the Anglo-American history of public carry," *id.* at 70, the Court reached a conclusion different from its offhand remark in *Heller*, holding that laws burdening concealed carry are *un*constitutional, at least where the state also forbids open carry, *see id.* at 52-55, 59.

The lesson for § 922(g)(1) is clear. Rather than treating *Heller*'s "presumptively lawful" passage as dispositive, courts must actually investigate the historical record to determine whether felon-disarmament laws are in fact consistent with the Second

Amendment. Indeed, the need for historical inquiry is even greater with respect to felon-disarmament laws than it was with respect to the concealed-carry ban in *Bruen*. *Heller* seemingly blessed the constitutionality of concealed-carry prohibitions by citing four sources—two cases and two treatises. 554 U.S. at 626. For felon-disarmament laws, by contrast, it cited no sources at all. *Id.* at 626-27. If the four sources supporting concealed-carry bans were insufficient to stave off a fuller historical analysis in *Bruen*, then it necessarily follows that *Heller*'s authority-free approval of felon-disarmament laws does not end the inquiry.

The Ninth Circuit made a similar point in its recent *Duarte* opinion, where it wrote that "the outcome of [*Bruen*] would have been much different" if the Supreme Court in *Bruen* had "endorsed simply deferring to *Heller*'s 'presumptively lawful' footnote." 2024 WL 2068016, at *7. Like felon-disarmament laws, "laws forbidding the carrying of firearms in sensitive places" were among the "presumptively lawful regulatory measures" identified in *Heller*. *Id.* But, the Ninth Circuit observed, "rather than go along with New York's 'attempt to characterize its proper-cause requirement as a longstanding "sensitive-place"' regulation under *Heller*, the *Bruen* Court rejected, as having 'no historical basis,' the argument that 'New York could effectively declare the island of Manhattan a "sensitive place"' where public carry could be categorically banned." *Id.* (quoting *Bruen*, 597 U.S. at 30-31). Thus sensitive-places laws, just like "any other firearm regulation challenged under the Second Amendment," can be upheld only if courts "analogiz[e] them to a sufficiently comparable historical counterpart." *Id.* And what is true of sensitive-places laws is true of felon-disarmament laws, too: "It would be fundamentally inconsistent with *Bruen*'s analytical framework to treat felon firearm bans any differently, as nothing in the majority opinion

implies that we can jettison *Bruen*'s test for one 'presumptively lawful' category of firearm regulations but not others (e.g., sensitive place regulations)." *Id.* at *8; *see also Atkinson*, 70 F.4th 1018 at 1022 (holding courts may not "sidestep *Bruen*" by relying on *Heller*'s "oft-quoted dicta describing felon-in-possession laws as 'presumptively lawful,'" but must instead "roll[] up [their] sleeves" and actually "examine[]" the historical record).

Every type of firearm regulation—even those on *Heller*'s "presumptively lawful" list—are subject to rigorous scrutiny to determine whether they are "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. Because the Fourth Circuit has never conducted that historical inquiry for felon-disarmament laws, its pre-*Bruen* cases do not resolve Mr. Massey's challenge. *See Coleman*, 2023 WL 6690935, at *2-5 (holding *Bruen* abrogated Fourth Circuit's post-*Heller* cases upholding § 922(g)(1), which necessitated full historical inquiry); *United States v. Ebron*, 2024 WL 2097228, at *2 (E.D. Va. May 9, 2024) (same).

## III.    Conclusion

For the reasons described above, § 922(g)(1) violates the Second Amendment, both on its face and as applied to Mr. Massey. The Court should dismiss the indictment.


/s/

John M. McKenna
Brennan, McKenna & Lawlor, Chtd.
6305 Ivy Lane, Suite 700
Greenbelt, MD 20770
(301) 474-0044

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this June 3, 2024, the foregoing was served on all parties via ECF.


_____/s/_____
John M. McKenna