**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **CRIMINAL NO. PX-24-41** |
| | ) | |
| **LESTER MASSEY, JR.,** | ) | |
| | ) | |
| **Defendant** | ) | |
| | ) | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

## TABLE OF CONTENTS

I.     Introduction..............................................................................................................1

II.    Procedural Background............................................................................................1

III.   Offense Conduct Proven at Trial ...........................................................................1

IV.   The United States Sentencing Guidelines Range....................................................3

      A.    Calculation of the Sentencing Guidelines Range........................................3

      B.    A Two-Level Increase Applies Because the Offense Involved
           at Least Three Firearms ...............................................................................3

      C.    Probation Correctly Computed Mr. Massey's Criminal
           History Score ................................................................................................7

V.    Section 3553(a) Sentencing Factors......................................................................8

      D.    Nature and Circumstances of the Offense ..................................................9

      E.    History and Characteristics of Mr. Massey................................................12

      F.    Need to Promote Respect for the Law and Protect the Public..............................20

      G.    Recommended Term of Supervised Release .........................................................20

VI.   Forfeiture...............................................................................................................21

VII.  Special Assessment...............................................................................................21

CONCLUSION...................................................................................................................22

CERTIFICATE OF SERVICE ...........................................................................................23

## I.    <u>Introduction</u>

The United States of America, by and through its undersigned counsel, hereby submits this memorandum in aid of sentencing the Defendant Lester Massey, Jr. for his conviction under 18 U.S.C. § 922(g)(1). Mr. Massey's sentencing is scheduled for Wednesday, October 1, 2025, at 2:00 p.m. ECF No. 166. The Government respectfully requests that the Court impose a sentence of 30 months' imprisonment, followed by three years of supervised release. The Government believes that this recommended sentence is sufficient, but not greater than necessary, to achieve the sentencing goals set forth in 18 U.S.C. § 3553.

The Government does not seek restitution but asks the Court to impose the $100 special assessment fee.

## II.    <u>Procedural Background</u>

After Mr. Massey was originally charged in 2024, ECF No. 1, on April 3, 2025, a superseding indictment was returned against him, charging him with possession of ammunition after having been convicted of a crime punishable by imprisonment for a term exceeding one year, to wit, a state misdemeanor punishable by more than two years of imprisonment, in violation of 18 U.S.C. § 922(g)(1), ECF No. 114. Following a two-day jury trial in July 2025, the jury found Mr. Massey guilty on the sole count in the Superseding Indictment, which carries a maximum statutory sentence of 15 years' imprisonment, up to three years of supervised release, and up to a $250,000 fine. ECF Nos. 155, 157, 162.

## III.    <u>Offense Conduct Proven at Trial</u>

According to evidence presented at trial and as summarized in the Pre-sentence Investigation Report ("PSR"), on August 11, 2023, members of law enforcement executed a court-ordered search and seizure warrant at the residence of **LESTER MASSEY, JR.** ("**MASSEY**") in Oxon Hill, Maryland ("the Residence"), stemming from an investigation of **MASSEY** pertaining to illegal possession of firearms and ammunition.

During the search, law enforcement located and recovered 243 live rounds of ammunition, unsecured, throughout the Residence. Specifically, in a bedroom that **MASSEY** shared with his six-year-old child, law enforcement found 90 rounds of assorted ammunition. In the bedroom closet, law enforcement recovered a box containing 15 rounds of 9mm ammunition and a second box containing 19 rounds of .40 caliber hollow point ammunition (from three manufacturers). On the bedroom nightstand, law enforcement found a box containing 50 rounds of .223 caliber ammunition and 4 rounds of assorted ammunition (including one round of 9mm, 1 round of .40 caliber, and two rounds of .223 ammunition, all from different manufacturers). On the bedroom dresser, law enforcement recovered 2 loose rounds of 9mm ammunition (from different manufacturers). In the bedroom, law enforcement also recovered a 9mm pistol magazine; a 5.56 NATO caliber, AR-type upper and lower receiver which fulfilled the federal definition of a "firearm" ("the Receiver"), and assorted firearm parts including a slide, spring, and barrel.

In the dining room, law enforcement recovered 143 rounds of 9mm ammunition (from two different manufacturers) from a box on the floor. In the hallway closet and on the porch, law enforcement recovered two additional pistol magazines, one of which was an extended magazine partially painted to match the Receiver (and which would hold corresponding .556/.223 caliber ammunition), and the other of which was a 10mm extended magazine. In the kitchen, law enforcement recovered 2 rounds of 9mm hollow point ammunition, a handgun slide, and a box containing 8 rounds of .40 caliber ammunition in a cabinet.

During the search, law enforcement read **MASSEY** his *Miranda* rights, which **MASSEY** acknowledged and waived. **MASSEY** told law enforcement that he had two types of ammunition, 9mm and .223 ammunition, and part of a firearm, a frame, in his bedroom closet. **MASSEY** also told law enforcement that he had shot a gun within the past one to two months on private property in Maryland and how when he would go shooting, he would shoot "everything," specifically including both handguns and rifles.

**MASSEY** knowingly possessed the 243 rounds of ammunition. Every round of ammunition was manufactured outside of Maryland and therefore traveled in interstate commerce prior to being possessed by **MASSEY** in Maryland on August 11, 2023.

Prior to August 11, 2023, **MASSEY** had been convicted of at least one crime punishable by more than two years of imprisonment. Furthermore, prior to August 11, 2023, **MASSEY** knew that he had been convicted of at least one crime punishable by more than two years of imprisonment. Specifically, **MASSEY** was convicted in 2009 in Prince George's County Circuit Court for conspiracy to distribute a controlled dangerous substance, for which he was sentenced to 3 years' imprisonment, with all but 1 year suspended. *State of Maryland vs. Massey*, Prince George's County Circuit Court, Case No. CT081461X. Additionally, **MASSEY** was convicted in 2012 in Prince George's County Circuit Court for possession of a controlled dangerous substance, for which he was sentenced to 4 years' imprisonment, with all but 1 year suspended. *State of Maryland vs. Massey*, Prince George's County Circuit Court, Case No. CT110937X.

*See* PSR ¶¶ 6-11, ECF No. 171.

IV.    **The United States Sentencing Guidelines Range**

A.    **Calculation of the Sentencing Guidelines Range**

A district court must "begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007). The Government agrees with the calculations made by the U.S. Probation Office ("Probation") within the PSR regarding the advisory U.S. Sentencing Guidelines ("Guidelines" or "U.S.S.G."). PSR ¶¶ 17-25, 35. Probation calculated Mr. Massey's Guidelines within the PSR as follows:

- The applicable base offense level is **14**, pursuant to U.S.S.G. § 2K2.1(a)(6)(A), because Mr. Massey was a prohibited person at the time he committed the instant offense;

- The offense level should be increased by **2** levels because the offense involved three to seven firearms, pursuant to U.S.S.G. § 2K2.1(b)(1)(A); and

- Mr. Massey's prior convictions result in a criminal history score of three and a **criminal history category of II**, pursuant to the Sentencing Table.

Based on an offense level of 16 and a criminal history category of II, Probation determined the resulting Guidelines' imprisonment range as **24** to **30** months. PSR ¶ 62. Probation recommends a sentence of 24 months' imprisonment, followed by 3 years of supervised release. *Id.* at 19.

B.    **A Two-Level Increase Applies Because the Offense Involved at Least Three Firearms**

As noted above, the PSR recommended that the Court apply the two-level enhancement under U.S.S.G. § 2K2.1(b)(1)(A) because Mr. Massey's offense involved between three and seven firearms. PSR ¶ 18. This is correct.

"Enhancements under Section 2K2.1(b) consistently reference the term 'offense,' not merely 'offense of conviction.'" *United States v. Bostic*, 168 F.3d 718, 724 (4th Cir. 1999). The Guidelines define "offense" as "the offense of conviction and all relevant conduct under § 1B1.3

3

. . . unless a different meaning is specified or is otherwise clear from the context." U.S.S.G. § 1B1.1, cmt. n.1(l). Under U.S.S.G. § 1B1.3(a)(2), relevant conduct for sentencing purposes includes "all acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2) applies because Mr. Massey's offense, covered by U.S.S.G. § 2K2.1, is "of a character for which § 3D1.2(d) would require grouping of multiple counts." *See* U.S.S.G. § 3D1.2(d). Acts "may qualify as the 'same course of conduct' 'if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses.'" *United States v. McDonald*, 28 F.4th 553, 563-64 (4th Cir. 2022) (quoting U.S.S.G. § 1B1.3 cmt. n.5(B)(ii)). Put differently, "the same-course-of-conduct standard requires only that the defendant be engaged in an identifiable pattern of certain criminal activity." *Id.* at 564 (cleaned up). Factors relevant to this inquiry include "the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses." U.S.S.G. § 1B1.3 cmt. n.5(B)(ii). When applying an enhancement based on the number of firearms under U.S.S.G. § 2K2.1(b)(1), the sentencing court counts "only those firearms that were unlawfully sought to be obtained, unlawfully possessed, or unlawfully distributed." U.S.S.G. § 2K2.1 cmt. n.5.

In support of applying a two-level enhancement for the number of firearms involved in the offense, the PSR included, as relevant conduct, that Mr. Massey: (1) was found in possession of the 5.56 NATO caliber, AR-type upper and lower receiver which fulfilled the federal definition of a "firearm" during the search of his residence; and (2) told law enforcement that he had shot at least two guns within the past one to two months, including both handguns and rifles. PSR ¶ 18. In addition, according to evidence presented at trial, Mr. Massey was found in possession of ammunition for at least three different types of firearms (9mm, .40 caliber, and .223 caliber), as

well as magazines for at least three different types of firearms (9mm, 10mm, and .556/.223 caliber)
on the date of the residential search. *Id.* ¶¶ 7-9.

Further, Mr. Massey's social media posts and videos on his cell phone showed that he
regularly possessed a host of firearms that he knew he was not permitted to possess. For example,
on October 9, 2022, Mr. Massey posted a video on Instagram of himself shooting an AR-style
rifle, Ex. 306B[1], and a video on TikTok of himself shooting a 9mm pistol, Ex. 307B. That same
day, Mr. Massey took another video of himself shooting a .40 caliber rifle. Ex. 517B.

  

*Mr. Massey shooting an AR-style rifle, a 9mm pistol, and a .40 caliber rifle on October 9, 2022.*

Additionally, Mr. Massey had photographs on his cell phone, dated May 14, 2023, less
than three months before the search of his residence, showing him shooting other AR-style rifles.

---

[1] The Government's numbering of exhibits refers to the exhibit list submitted to the Court and
Counsel for Mr. Massey, via email, on July 18, 2025. The submitted exhibit list is attached for
reference as Exhibit A. Exhibits referred to in the Government's memorandum that were not
included in the previously submitted exhibit list are labeled by letter, *e.g.*, Exhibit B.

 

*Mr. Massey shooting AR-style rifles on May 14, 2023*

Based on the foregoing evidence, it is apparent that Mr. Massey's offense—his common course of conduct—involved at least three firearms. Specifically, over the course of 10 months, Mr. Massey repeatedly possessed firearms after having been convicted of a crime punishable by more than two years of imprisonment. As shown above, sufficient evidence exists showing that Mr. Massey possessed and shot several different firearms on October 9, 2022, and May 14, 2023, as examples. Moreover, these incidents are sufficiently connected temporally and involved a regular pattern of similar conduct: the illegal possession of ammunition and firearms, to be considered relevant conduct. *See McDonald*, 28 F.4th at 565 ("The events here were both regular and sufficiently connected temporally, as McDonald engaged in a particular pattern of behavior over a limited period of time: three instances of felon-in-possession conduct over the course of nine months."); *see also United States v. Canty*, No. 22-4020, 2022 WL 3681680, at *1 (4th Cir. Aug. 25, 2022) ("Although there was a nine-month interval between the June 2019 and March 2020 incidents, we have found an eight-month gap was not so large as to preclude a finding of relevant conduct for a felon-in-possession offense."). As discussed in greater detail below, this is

a conservative estimate and Mr. Massey in fact possessed far more than three firearms while knowing he was prohibited. Therefore, the two-level enhancement should be applied to account for the firearms that Mr. Massey possessed in October 2022 and May 2023, *e.g.*, and the various kinds of ammunition and magazines found in his apartment that were designed for at least three different types of firearms.

### C.    Probation Correctly Computed Mr. Massey's Criminal History Score

Probation correctly assessed Mr. Massey's prior convictions and concluded that those convictions result in a criminal history score of three and a criminal history category of II. PSR ¶ 35. Those three criminal history points are associated with a prior conviction from 2009, where Mr. Massey was originally sentenced to three years imprisonment, all but one year suspended, to be served on home detention, and to a term of three years of supervised probation. *See* PSR ¶ 32; *see also State of Maryland vs. Massey*, Prince George's County Circuit Court Case No. CT081461X. Thereafter, on March 9, 2012, Mr. Massey was found in violation of probation and sentenced to 18 months' imprisonment. *Id.*

To evaluate a defendant's criminal history, "[i]n the case of a prior revocation of probation[,]" as applicable here, the Guidelines instruct to "add the original term of imprisonment" to the "term of imprisonment imposed upon revocation[,]" and to use that total to compute criminal history points. U.S.S.G. § 4A1.2(k)(1). Here, as noted above, Mr. Massey was originally sentenced to three years imprisonment, all but one year suspended, to be served on home detention. *See* PSR ¶ 32; *see also State of Maryland vs. Massey*, Prince George's County Circuit Court Case No. CT081461X. Guidelines treat home detention as a "substitute for imprisonment." U.S.S.G. § 5F1.2. However, Mr. Massey's 18-month revocation sentence exceeds one year and one month, and thus, scores three criminal history points, pursuant to U.S.S.G. § 4A1.1(a).

**V.     Section 3553(a) Sentencing Factors**

After calculating the sentencing guideline range, the Court must consider 18 U.S.C. § 3553(a) factors before imposing the sentence. *Gall*, 552 U.S. at 49-50. The statutory factors for the Court's consideration under Section 3553(a) include: (1) the nature and circumstances of the offense and history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public, and provide the defendant with needed services; (3) the kinds of sentences available; (4) the kinds of sentence and sentencing range established for the applicable offense; (5) any pertinent policy statement; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.

"In determining the sentence to impose within the guideline range, or whether a departure from the guidelines is warranted, the court may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law." U.S.S.G. § 1B1.4; *see also* 18 U.S.C. § 3661. "If the district court decides to impose a sentence outside the guidelines range, it must ensure that its justification supports 'the degree of the variance.'" *United States v. Evans,* 526 F.3d 155, 161 (4th Cir. 2008) (quoting *Gall,* 552 U.S. at 51). The district court is given "some latitude" and "a degree of deference" to tailor a particular sentence to the circumstances. *United States v. Green,* 436 F.3d 449, 456-57 (4th Cir. 2006); *United States v. Moreland,* 437 F.3d 424, 433 (4th Cir. 2006).

The Government respectfully submits that a sentence of **30 months' imprisonment, followed by three years of supervised release**, will be sufficient, but not greater than necessary in light of the relevant § 3553(a) factors.

### D.     Nature and Circumstances of the Offense

The nature and circumstances of the charged offense are serious. Mr. Massey intentionally possessed ammunition—specifically, 243 live rounds—after having been previously convicted of offenses involving dangerous controlled substances. When officers searched the residence, they found 243 rounds of assorted ammunition unsecured throughout multiple rooms.

In a bedroom that Mr. Massey shared with his six-year-old child, officers recovered 90 bullets of various calibers, assorted gun parts, and an AR-type upper and lower receiver which met the federal definition of a "firearm." A box of ammunition in Mr. Massey's bedroom closet advertised that its ammunition was "the last round you will ever need" and described its ammunition as "R.I.P." standing for "Radically Invasive Projectile." The ammunition contained in this box is often referred to as "hollow-point" or "fragmenting" ammunition because it is designed to create multiple wound channels by fragmenting into several pieces.[2]



*Box of hollow point ammunition found in Mr. Massey's bedroom closet*

---

[2] Matthew Benard, Christine Dahlhausen, Andrew Kirk, & Andrew Bernard, *Fragmenting projectiles: a case report and literature review of the G2 Radically Invasive Projectile*, The American Association for the Surgery of Trauma, Trauma Surgery & Acute Care Open, Vol. 9, Issue 1 (Feb. 17, 2024), https://tsaco.bmj.com/content/9/1/e001355.

In Mr. Massey's bedroom, officers also recovered controlled substances and materials commonly used in the distribution of controlled substances. Specifically, officers seized 17.39 grams of methamphetamine hydrochloride and .274 grams of cocaine base. Officers also found a money counter and a digital scale, as well as drug packaging equipment, including empty white gelatin pill capsules and small hinged lid containers throughout the residence.

 

*17.39 grams of methamphetamine*



*.274 grams of cocaine inside a shoe with empty gelatin pill capsules*

On Mr. Massey's dining room floor, officers found 143 rounds of 9mm ammunition. In Mr. Massey's kitchen cabinets, officers found two rounds of 9mm hollow point ammunition, a 9mm handgun slide, and a box containing eight rounds of .40 caliber ammunition. Finally, in the hallway closet and on the porch, officers recovered two pistol magazines, one of which was an extended magazine.

Mr. Massey's unlawful possession of hundreds of rounds of ammunition throughout the home he shared with his young daughter created an dangerous environment, even without the

variety of different caliber gun parts, controlled substances, and drug distribution equipment.

Mr. Massey's mindset is also particularly concerning. Mr. Massey committed this offense, and regularly shot firearms, with the full knowledge that he was a "felon" who was prohibited from possessing a firearm, as he freely admitted during his *Mirandized* interview with law enforcement during the search. Mr. Massey told law enforcement that he does not "go to no gun store" because "I'm just, I was just working . . . just working, I'm trying, work on . . . work on getting my felony sealed now so ain't no point in me no going, going to no stores or nothing like that if I can't go in there and buy one." Further, when law enforcement asked Mr. Massey, "You're not allowed to have a gun right?" Mr. Massey responded, "Nah, nah, nah . . . ." The law enforcement officer said, "you know that with your criminal history, you're not supposed to have guns?" Mr. Massey answered, Yeah, I gotcha. I got you." The officer then said, "You can't shoot, you know that you can't shoot." Mr. Massey replied, "I got it. I got it. But you come on, man, you know." Despite Mr. Massey's acknowledgment that he is not allowed to have a gun, he told law enforcement that he shot a gun "about a month ago."

Following his arrest, Mr. Massey further demonstrated his understanding of his prohibited status during a recorded jail call with a female associate. During this call, Mr. Massey explained that agents had shown Mr. Massey a social media video of him shooting a gun. Mr. Massey explained to her, "I was prohibited from shooting the gun, because I . . . because, you know, because I'm a felon." During the same call, Mr. Massey explained that he had apparently been advised that he was prohibited from shooting by an employee of Maryland Small Arms Range, Inc., a gun range located in Upper Marlboro, Maryland. Mr. Massey told her, "well I went to Small Arms, shooting, you know I went and shot [at] Small Arms. And he's like well technically you don't have a felony but federally it is. State it's not, it's a misdemeanor." Mr. Massey went on to

explain that this was because of his "distribution" conviction, in an apparent reference to his 2009 conviction for conspiracy to distribute phencyclidine ("PCP").

### E.    History and Characteristics of Mr. Massey

Mr. Massey's criminal history and extensive brazen firearm-related activities demonstrate the danger that he poses to the community and the need for a significant sentence to deter him from continuing to violate the law.

First, Mr. Massey has two serious controlled substances convictions. In 2009, Mr. Massey was convicted for conspiracy to distribute PCP, for which he was sentenced to 3 years imprisonment, with all but 1 year suspended, to be served on home detention, and to a term of 3 years of supervised probation. *State of Maryland vs. Massey*, Prince George's County Circuit Court, Case No. CT081461X. As noted above, on March 9, 2012, Mr. Massey was found in violation of probation and sentenced to 18 months' imprisonment. *Id.* Additionally, Mr. Massey was convicted in 2012 for possession of PCP and marijuana, for which he was sentenced to 4 years imprisonment, with all but 1 year suspended, and to a term of 3 years of supervised probation. *State of Maryland vs. Massey*, Prince George's County Circuit Court, Case No. CT110937X. Mr. Massey's criminal history underscores the need for specific deterrence. The criminal justice system's prior interventions and disruptions to Mr. Massey's life have not prevented further criminal conduct. Thus, a significant sentence such as the Government requests is necessary to specifically deter Mr. Massey from continuing to engage in dangerous illegal conduct. His resistance to supervision throughout the course of his pre-trial supervision in this case also underscores the need for imprisonment to break the cycle.

Notably, moreover, the investigation in this case made clear that Mr. Massey's unlawful involvement with ammunition and firearms extended beyond possession. Mr. Massey also

manufactured firearms, commonly referred to as privately made firearms ("PMFs") or "ghost guns."[3] The upper and lower receiver and gun parts recovered from his bedroom were for an AR-style pistol, meaning a pistol that has a shorter barrel length and stock than an AR-style rifle. Also recovered from the house was an extended magazine capable of receiving more than 15 rounds of ammunition. Mr. Massey also had the slide of a 9mm handgun stored in his kitchen cupboard.

A review of one of Mr. Massey's phones showed he kept in his residence fully-assembled PMFs, as well:



*December 17, 2021 Photo of AR-style Pistol Equipped with a Drum Magazine, Scope, and Laser Sight.[4]*

---

[3] "Ghost guns" are made in parts, do not have serial numbers, and can be assembled at home without receiving a license or submitting to a background check. Annie Karni, Ghost Guns: What They Are, and Why They Are an Issue Now, N.Y. Times (Apr. 9, 2021), https://www.nytimes.com/2021/04/09/us/politics/ghost-guns-explainer.html (last visited Sept. 18, 2025). Gun safety groups report that these untraceable firearms disproportionately affect day-to-day gun violence in vulnerable communities across the country. Abené Clayton, Ordered online, assembled at home: the deadly toll of California's 'ghost guns,' The Guardian (May 18, 2021), https://www.theguardian.com/us-news/2021/may/18/california-ghost-guns-deadly-toll (last visited Sept. 18, 2025).

[4] The sheets in this photo appear to match the sheets on Mr. Massey's bed at the time of the search warrant and his arrest. Also, the carpet matches his bedroom, and the headphones appear consistent with the video game consoles found in his bedroom during the search.

A review of Mr. Massey's text messages also showed that in October 2021, Mr. Massey confirmed to an associate that Mr. Massey possessed an AR lower receiver, although Mr. Massey did not respond via text message when asked if it was a completed firearm. Ex. 505. Days later, in a different text exchange another associate expressed urgency at acquiring "them toys" even if they had not been assembled and Mr. Massey stated that he "got one lower today." Ex. 509.

The search of Mr. Massey's phone also revealed that he had filmed himself on or around October 9, 2020, narrating his assembly of a PMF handgun across three videos (with his daughter audible in the background).[5] Exs. 401B, 402B, 403B. In the first video, Mr. Massey can be seen and heard operating a drill press as he drills a pistol frame through a red jig. Ex. 401B. In the second video, Mr. Massey identifies the pistol as a "Glock 27" and that the kit has "two holes," one of which he can be seen drilling through. Ex. 402B. And in the third video, Mr. Massey holds the pistol frame up to camera and describes his modifications to the frame as, "smooth as a whistle." Ex. 403B. The same search identified photographs of additional pistol style PMFs in Mr. Massey's phone. Exs. 404A and 405A. Mr. Massey's phone also revealed that he provided his gunsmithing services for others (Ex. 504) and that he consulted with others regarding his firearms manufacturing (Ex. 506).

There is also extensive evidence that Mr. Massey possessed and sold a number of firearms in the years leading up to his arrest. The search of a cellphone belonging to a separately charged associate of Mr. Massey ("Associate A") revealed that on November 13, 2021, Mr. Massey sent a

---

[5] At the start of Exhibit 401B, Mr. Massey identifies the PMF as a "P80 lower kit." P80 is a likely reference Polymer80, Inc., the former largest producer of ghost gun kits which sold a popular Glock-style pistol kit which included a pistol frame with an included red jig and drill bits. Polymer80 ceased operations in 2024. Everytown For Gun Safety (September 6, 2024) https://www.everytown.org/polymer80-morally-bankrupt-out-of-business/ (last visited September 17, 2025).

video to Associate A's cellphone utilizing the Google Duo application. The video (screenshots below) captures a black and silver firearm on the leg of an individual and three additional firearms on the floor while Mr. Massey can be heard saying, "Deuce, deuce. Two-fifty. Twenty-two for two-fifty, shorty." Ex. B. The reference in the video to "deuce, deuce" and "twenty-two" is a common reference to a .22 caliber firearm, and the audio offers the firearm for sale for $250. *Id.* There was no .22 caliber ammunition recovered from Mr. Massey's residence on August 11, 2023. Two screenshots that depict the four firearms are included below for reference:



*Screenshots from Ex. B.*

A review of Mr. Massey's social media revealed that in September 2021, Mr. Massey used his social media account to sell a Beretta pistol to an individual utilizing the account name "Nunu Jenkins." Exs. 300 and 301.



*Screenshot from Ex. 301*

These were not the only firearms that Mr. Massey appears to have possessed and sold. In May 2023, Mr. Massey endeavored to sell two pistols via social media. Ex. 310. On April 16 2022,

Mr. Massey offered a 9mm pistol for sale for $750. Exs. 511 and 511A. The next day, Mr. Massey appears to have offered the same firearm (Ex. 516A) for $700. Ex. 516. To this customer, Mr. Massey represents that he is selling this firearm on behalf of an unidentified third party who has three firearms left. *Id.* Also, in February 2022, Mr. Massey, in the midst of discussing firearm repairs with a different customer, stated that " . . . I will let my ar go for 7 . . ." Ex. 513. That customer stated, "I want that ar. Because I need one that work right. Like today.' *Id.*

Additionally, Mr. Massey has a number of connections to a particular Federal Firearms Licensee ("FFL") which has a facility in Maryland. This includes that his former upstairs neighbor and friend was employed as a security guard at the FFL during a time period that Mr. Massey had ready access to firearms that had been previously associated with that facility. Mr. Massey admitted to knowing that individual, but claimed they only talked about Mr. Massey's shooting. To the contrary, though, Mr. Massey sent a photo of a firearm from that same FFL to Associate A, who Mr. Massey knew was a convicted felon, and which Associate A appears to have sold to a third individual, as follows:



*November 20, 2021 Beretta APX Photo*[6]

---

[6] The sheets in this photo appear to match the sheets on Mr. Massey's bed at the time of the search warrant and his arrest and the sheets in the background of the above-described December 17, 2021 photograph of the AR-style pistol equipped with a drum magazine, scope, and laser sight.

In October 2022, Associate A was arrested in possession of two firearms from the same FFL, and one of these firearms was a former law enforcement service weapon. A review of Associate A's phone disclosed that on March 26, 2022, Associate A texted Mr. Massey, "[a] cuz how much would you hit me for 3 of them cuz" and Mr. Massey replied, "14 no lower." Law enforcement later identified on Mr. Massey's phone a photograph, dated March 26, 2022, of a used black Beretta handgun bearing serial number BER030948, which was not among the firearms recovered from Associate A's subsequent arrest (Ex. 414A):



Law enforcement's records showed that this former service weapon had been returned to the FFL. Mr. Massey also had a number of photos of a tan and black Beretta APX model handgun,

for example (*e.g.*, Exs. 409A and 416A). This handgun bears two different but nearly sequential serial numbers: A0378832X and A0378834X



*Close-up of Ex. 409A*

Thus, it appears this is a composite firearm built from parts of two separate firearms—and the near-sequential serial numbers strongly suggests the same origin. The FFL reported A037882X (the serial number on the ejection port) as lost in December 2022.

Through all of this, the investigation revealed that Mr. Massey was extensively involved with firearms over a lengthy period of time, despite full knowledge that he was not allowed to possess any firearms. The nature and circumstances of the offense of his possession of the hundreds of live rounds of ammunition when the search warrant was executed is very serious and part-and-parcel of his longstanding disregard for the law.

### F.      Need to Promote Respect for the Law and Protect the Public

For the reasons above, Mr. Massey's crime demands a sentence that promotes respect for the law and ensures the safety of our community. Mr. Massey has been prohibited from possessing firearms and ammunition for over a decade. However, Mr. Massey's previous convictions have not deterred him from possessing ammunition and firearms or from shooting, manufacturing, and selling firearms in recent years. Further, Mr. Massey's previous prison sentences did not deter him from possessing 243 live rounds of assorted ammunition, an upper and lower receiver, and controlled substances when the residential search warrant was executed. A sentence of 30 months reflects the need for both specific and general deterrence in this case, both to deter Mr. Massey himself from future criminal conduct and to deter others from unlawfully possessing firearms and ammunition.

### G.      Recommended Term of Supervised Release

The Government requests a 3-year term of supervised release for the reasons discussed above. Such a term is particularly appropriate given Mr. Massey's repeated non-compliance with the terms of his pre-trial release conditions in this case. Since March 20, 2024, when Mr. Massey was ordered released on his personal recognizance, Pre-trial Services filed four notices of apparent violation. The first notice, dated February 11, 2025, reported that Mr. Massey was not at work during part of his scheduled work hours, and instead, was visiting with friends and going to stores. The second notice was filed less than a month later on March 3, 2025. That notice reported that Mr. Massey was using social media when he was prohibited from accessing the internet outside of communication with his attorney and detailed troubling social media posts on Mr. Massey's Facebook page. Specifically, on October 8, 2024, Mr. Massey had posted, "Now do it take a person 15 months to get sentenced after there plea deal," an apparent attempt to draw attention to a

defendant pending sentencing. On September 24, 2024, Mr. Massey had posted, "quick question if a person take a plea deal would it take him a year to get sentence I know just want to know other people. Know for the people that know this answer comment. Suitland side." Given the concerns that Mr. Massey's posts raised, a bail hearing was promptly scheduled. ECF No. 110. At the hearing, Chief Magistrate Judge Sullivan admonished Mr. Massey and warned that witness intimidation will not be tolerated. *Id.* Three weeks later, on March 26, 2025, the third notice was filed, detailing Mr. Massey's failure to comply with his home confinement with location monitoring conditions. Finally, on April 11, 2025, the fourth notice was filed, explaining that Mr. Massey continued to disregard the terms of his home confinement conditions.

Mr. Massey's demonstrated and continued disregard for his Court-ordered pre-trial release conditions shows that a 3-year term of supervised release is not only appropriate, but necessary to protect the public. Further, Mr. Massey was subject to a comparable length of supervised probation, a 3-year term, in connection with his two prior state convictions, PSR ¶¶ 32-33, and a similar term of 3 years would be appropriate here to specifically deter Mr. Massey from further engaging in criminal conduct.

## VI.    <u>Forfeiture</u>

The Government asks the Court to incorporate the motion for forfeiture of property, ECF No. 172 into the Court's judgment.

## VII.    <u>Special Assessment</u>

The Government respectfully requests that the Court order Mr. Massey to pay the $100 mandatory special assessment fee.

## **CONCLUSION**

For the foregoing reasons, and based upon additional information that may be presented at the sentencing hearing, the Government respectfully requests that the Court impose a sentence of **30 months' imprisonment, followed by three years of supervised release**, which the Government views as sufficient, but not greater than necessary, to achieve the purposes of sentencing.

Respectfully submitted,

Kelly O. Hayes
United States Attorney

By:    /s/ _____
Brittany Appleby-Rumon
Special Assistant United States Attorney

Elizabeth Wright
Nicholas F. Potter
Assistant United States Attorneys

cc:    Marc G. Hall, Esq.
Erik Finneyfrock, U.S. Probation Officer

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a copy of the foregoing was filed with the Clerk of the Court using the CM/ECF system on September 19, 2025.

/s/ _____
Brittany Appleby-Rumon
Special Assistant United States Attorney